Judith HUNTER, et al., Plaintiffs,

v.

**WESTINGHOUSE ELECTRIC CORPORATION, et al., Defendants.**

No. C–2–76–469.

United States District Court, S.D. Ohio, E.D.

May 31, 1983.

Barbara A. Terzian, Columbus, Ohio, for plaintiffs.

Michael J. Renner, Columbus, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

Plaintiffs Judith Hunter, Marlene Murray, formerly Marlene Campbell, and Shirley Vance bring this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, to remedy certain acts of employment discrimination allegedly suffered at the hands of their former employer, Westinghouse Electric Corporation. Specifically, plaintiffs claim that they were discriminated against on the basis of sex when they were terminated in September 1969 following an illegal work stoppage. Plaintiffs also claim that their terminations were in retaliation for past complaints of discrimination, and that they were further discriminated against while employed at Westinghouse with regards to promotions, pay and overtime. Plaintiffs have also sued their local union for violations of Title VII and Scovill Manufacturing, a successor to Westinghouse.

This case was tried to the Court from December 14, 1982 until December 23, 1982. The union was not represented by counsel and made no appearance at trial. At the close of plaintiffs' case-in-chief, the Court dismissed the claims against defend-

ant Scovill pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. In addition, the Court at that time dismissed all allegations of retaliation except plaintiff Vance's allegation of retaliation.

Following the trial, plaintiffs and defendant Westinghouse submitted separate post-trial memoranda. This case is now ripe for a decision on the merits. The Court's findings of fact and conclusions of law follow. Fed.R.Civ.P. 52(a).

## I

Plaintiff Marlene Campbell is a female, who was hired by Westinghouse on August 4, 1966, and who at the time of her discharge was employed as a day shift inspector on the iron assembly line at the Byesville, Ohio, plant of defendant Westinghouse Electric Corporation. Prior to her discharge in September 1969, Ms. Campbell's employment record contains no indication of any disciplinary problems.

Plaintiff Judith Hunter is a female who was hired by Westinghouse in April 1969 and who at the time of her discharge in September 1969 was employed as a day shift assembler on the iron assembly line at the Byesville plant. Prior to her discharge, Ms. Hunter experienced no disciplinary problems while employed at Westinghouse.

Plaintiff Shirley Vance is a female who was hired by Westinghouse in May 1969 and who was also an assembler on the iron assembly line at the time of her discharge. Ms. Vance's employment record discloses no disciplinary problems prior to her discharge. The assembler positions held by Ms. Vance and Ms. Hunter were entry level, grade 1 positions. The inspector position held by Ms. Campbell was a grade 2 position. All plaintiffs were members of Local Union 2196, a party to the collective bargaining agreement with Westinghouse.

The plant owned and operated by Westinghouse in Byesville, Ohio, was primarily involved in the manufacture of consumer, household appliances. The Byesville plant first began operations sometime in 1965. The iron assembly line at the Byesville plant had been moved from a Mansfield plant sometime in the spring of 1969. Westinghouse continued to operate the Byesville plant until approximately May 1972 when that plant was purchased by Scovill. The Byesville plant is no longer in operation. At all times relevant to the events of this lawsuit, Charles Warner was the plant manager for Byesville; Charles Welsh was the director of employee relations; Warren Huffman and Don Walters had supervisory responsibility for the iron assembly line.

During all times relevant to this lawsuit, defendant Westinghouse operated two shifts at Byesville—the day shift worked from 7:00 a.m. to 3:00 p.m. and the second shift worked from 3:00 p.m. to 11:00 p.m. Approximately 50 to 60 people were employed on the iron assembly line for each shift. Work on the assembly line took place in the following sequence: assembly, buffing and polishing, wiping, final inspection and packing.

As of the date of the plaintiffs' discharges in September 1969, there were no women employed as buffers, material handlers, supervisors, or set-up employees on the iron assembly line or elsewhere in the plant. As of that date, Westinghouse employed 370 female hourly employees and 147 male hourly employees. In addition, as of that date, there were in existence ten job grades or classifications. No women at the Byesville plant held any job with a grade classification higher than grade 4.

The process for selecting persons to fill the diverse jobs at the Byesville plant varied depending on the job to be filled. Generally, supervisors were selected by the plant and personnel managers. Other positions at the plant were usually filled by using a bidding procedure whereby a qualified individual with the most seniority who bid for a job received that job. Defendant Westinghouse contends that no woman ever bid for a job with a classification higher than grade 4. Plaintiffs contend that job openings were not posted and that they were never made aware of the bidding procedures.

During the summer of 1969, there were numerous complaints made by employees, including the plaintiffs, concerning working conditions at the Byesville plant. In the summer of 1969, plaintiff Hunter, along with Ms. West and Ms. Adams, wipers on the iron line, complained to Don Walters, supervisor of the iron assembly line, about the dirty restrooms and metal dust coming from the buffing area. Plaintiff Campbell also complained about the dust from the buffing area and the dirty restrooms.

In addition, at about the same time, Ms. Campbell began collecting complaints from women on the iron line and recording those complaints in a notebook. See defendant's Exhibit Q.[1] Among the complaints collected in the notebook, and those which Ms. Campbell personally communicated to both the supervisor of the iron assembly line, Mr. Walters, and the director of employee relations, Mr. Welsh, were the following: dirty working conditions; unfair denial and distribution of overtime; and supervisors doing hourly work. Ms. Campbell also communicated many of these problems to Mr. Hlad, the shop steward for Local 2196, employed as a set-up employee on the iron line and to Mr. Bates, a member of the union executive board.

Shortly after making these complaints to union and management officials, though no date was specified at trial, Ms. Campbell was moved from her job as final inspector on the iron line and given a job as valve inspector. This later job was in the same grade but required her to work closer to the buffers. Ms. Campbell filed no grievance concerning this job change.

In August 1969, Ms. Campbell was called into Mr. Welsh's office for a meeting. Present at that meeting were Mr. Gaydosik, president of Local Union 2196; Mr.

Witte, a representative of the International Union, and Mr. Hlad. At this meeting Ms. Campbell complained about being transferred from her final inspector's job but did not discuss any of the problems she had recorded in the notebook. Mr. Hlad was instructed at that meeting by union officials to file a grievance on behalf of Ms. Campbell. No grievance was ever filed.

During this same period of time, in the summer of 1969, plaintiff Vance also made complaints to union and management officials concerning various aspects of her job at the plant. Specifically, she complained about the lack of women in supervisory jobs and the fact that men in higher grade jobs were assigned overtime in place of women in lower grade jobs. Ms. Vance initially made her overtime complaints to Mr. Hlad, the shop steward. When no action was taken by Mr. Hlad, Ms. Vance complained to Don Walters, a supervisor on the iron assembly line, about the fact that a male employee in a higher grade, Joe Underwood, was being given overtime work in her grade 1 assembler classification. At the same time, Ms. Vance informed the union president, Mr. Gaydosik, that she was being unfairly denied overtime. Both Mr. Walters and Mr. Gaydosik informed plaintiff Vance that as a matter of company policy men were given overtime because men had families and therefore needed the money more than women. Ms. Vance never filed a grievance concerning the assignment of overtime.

The enunciated company policy with respect to overtime was to offer overtime to the employee within a particular labor grade with the least amount of overtime to date. Supervisors were responsible for the assignment of overtime. In some circumstances employees in higher labor grades did perform overtime work in lower grade

---

**1.** There is some dispute in this case as to how and why Ms. Campbell began collecting complaints and recording them in a notebook. Ms. Campbell claims that Mr. Hlad, the union steward, gave her the notebook and instructed her to take down any complaints from the women on the iron line. Ms. Campbell further testified that Mr. Hlad told her that he could not deal

with these "crying females" and that therefore she should record their complaints. Mr. Hlad denied giving Ms. Campbell the notebook and further denied ever instructing her to take down the complaints of women on the iron line. The fact that Ms. Campbell kept the notebook and used it to record complaints is the only fact this Court considers significant.

jobs. These circumstances included instances where no lower grade employees agreed to work overtime or no employees in lower grade jobs were present at the plant to do the overtime which normally would have been assigned to them.

■ Prior to June 1969, there were some circumstances where Joe Underwood, a material handler, did perform overtime work, which normally would have been reserved for employees in lower job classifications. In June 1969, Joe Underwood was replaced by Eugene Oliver and no other complaints were received with regard to male employees being improperly assigned more overtime work than female employees.[2]

In addition to complaining about overtime, Ms. Vance complained about the dirty restroom conditions. Eventually, Ms. Vance called the Health Department concerning the conditions in the restrooms. Following this complaint, the sanitary conditions in the restrooms improved.

On September 9, 1969, the day prior to the wildcat strike, Ms. Vance was called into Mr. Welsh's office. At that time she repeated her complaints about the unfair distribution of overtime and informed Mr. Welsh and Mr. Gaydosik that she was being discriminated against. They informed Ms. Vance that overtime was being assigned fairly and in a nondiscriminatory fashion.[3] Ms. Vance continued to insist that she was being unfairly denied overtime. At that time, Ms. Vance also re-

quested that union officials, including Mr. Gaydosik, Mr. Hall and Mr. Vincent, file a grievance concerning overtime on her behalf. They refused.

Following that meeting, Ms. Vance was moved to a wiping job, right next to the buffers, on the iron assembly line. This job was performed on the line closest to the buffers and therefore closest to the metal dust from the buffing machines. Mr. Warner, the plant manager; Mr. Welsh, the personnel director; and Mr. Huffman, a supervisor at the plant, observed plaintiff Vance at this new job and asked her how she liked this new job. When Ms. Vance responded, in jest, that she loved this job and wanted a permanent assignment as a wiper, she was moved back to her normal job.

As has already been noted, in the weeks prior to September 10, 1969, there were complaints from employees, including not only the plaintiffs but also male employees on the iron line, concerning the working conditions at the Byesville plant. During this period of time, rumors began to circulate among employees that there would be a strike if steps were not taken by the company to remedy some of the problems at the plant.

On September 9, 1969, the rumors about a possible work stoppage reached a peak. On that day, plaintiff Hunter spoke with Wilma Womac, a day shift assembler on the iron assembly line. Ms. Womac informed plaintiff Hunter that the buffers on

**2.** Plaintiff Vance also claims that she applied for Underwood's material handlers' job. First, the Court notes that there is no evidence that Ms. Vance bid for this job. Even assuming the bidding procedure had been followed, however, there is no evidence concerning the qualification or seniority of plaintiff as opposed to Mr. Oliver. Absent some additional evidence on this question, the Court is unable to conclude that the failure to choose plaintiff for Underwood's material handler's position constituted illegal sex discrimination. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**3.** There is some dispute concerning the precise nature of Ms. Vance's overtime complaint. De-

fendant Westinghouse maintains that it believed that Ms. Vance was dissatisfied with the distribution of overtime between the first and second shifts, not the distribution of overtime between men and women at the plant. Defendant Westinghouse further claims that in response to Ms. Vance's complaint concerning overtime, Mr. Welsh showed her computer printouts which substantiated Welsh's contention that overtime was being distributed fairly between shifts. These printouts were not made available to the Court at trial. Defendant finally contends that it was under the impression that the problem was resolved when Mr. Welsh offered to allow plaintiff Vance to come in at 5:30 a.m. to do any overtime work that needed to be done. Ms. Vance agreed to come into work at that time.

the iron assembly line were going to lead a walkout on that day at approximately 2:00 p.m. When no such walkout occurred, Ms. Womac informed plaintiff Hunter that the walkout would take place on September 10, the following day, and that picket lines would be set up on the morning of September 10.

Plaintiff Vance also had a conversation with Ms. Womac on September 9 concerning the work stoppage. Ms. Womac also informed Ms. Vance that there would be a strike the following day. Moreover, Ms. Womac told plaintiff Vance that this strike had the support of the union. Neither Ms. Vance nor Ms. Hunter spoke to anyone else about their conversations with Ms. Womac or the work stoppage planned for September 10.

Plaintiff Campbell did not speak to Ms. Womac at all on September 9. However, early on the morning of September 10, Ms. Womac called Ms. Campbell at home to tell her that there would be a strike that day. None of the plaintiffs prepared or brought picket signs to the plant on the morning of the 10th. The picket signs were made by Ms. Womac and Ms. Thompson.[4] In addition, Mr. Hlad, the shop steward and a witness for defendant Westinghouse, testified that following the strike he learned that male employees, including a Mr. Jack Bates, had made picket signs.

On September 10, Ms. Hunter arrived at the Byesville plant along with a co-employee, Carol Murgatroyd, at her usual time of 6:30 a.m. When plaintiff Hunter arrived at the Hope Avenue entrance to the plant, Wilma Womac and Anna Thompson were carrying picket signs at the entryway to the company parking lot. Ms. Hunter parked her car and she and Ms. Murgatroyd joined the picket line. She did not speak to anyone. Ms. Hunter estimated that by 7:00 a.m. there were approximately 100 people on the picket line, including a number of men. Ms. Hunter specifically recalled the following men on the picket line: Wayne Red and Joe Ogle.

On the morning of September 10, plaintiff Campbell arrived at the Byesville plant sometime between 6:00 and 6:30 a.m.; she normally arrived at 6:40 a.m. When Ms. Campbell arrived at work that morning, she observed a handful of people on a picket line outside the entrance to the company parking lot on Hope Avenue. Ms. Campbell could not recall if any men were on the picket line at that time. After parking her car, Ms. Campbell entered the plant and spoke to Mr. Gaydosik. There is a dispute as to the substance of that conversation. Mr. Gaydosik claims that Ms. Campbell asked him if he was going to join the picketers, to which he allegedly responded that the strike was illegal. Ms. Campbell claims that she simply informed Mr. Gaydosik that there was a strike and requested that he speak to the strikers.

Following this brief conversation, Ms. Campbell left the plant and moved her car off the company parking lot. She then joined the picketers. At that time, there were men, as well as women, at the Hope Avenue entrance to the plant. Ms. Campbell claimed that Wilma Womac and Anna Thompson made the picket signs and that Myrna Valentine gave her directions on the day of the strike. Ms. Womac, Ms. Thompson and Ms. Valentine did not testify at trial.

Ms. Vance arrived at the Byesville plant sometime between 6:45 and 7:00 a.m. on the day of the strike. She parked her car on company property and observed "close to 100 people" outside the plant. Mr. Warner, the plant manager, arrived at approxi-

---

**4.** As will be hereinafter noted, following the strike Ms. Womac and Ms. Thompson were also suspended. Both women were interviewed by Mr. Welsh, who reduced their statements to writing following their suspensions. Ms. Womac and Ms. Thompson claimed, as is evidenced by the statements prepared by Mr. Welsh, that they did not make any signs and that either some or all of the plaintiffs made these signs. The Court views these statements by Ms. Womac and Ms. Thompson with a great deal of skepticism since at the time these statements were made Ms. Womac and Ms. Thompson were not under oath; were suspended from their employment; and were meeting with management in an attempt to regain their employment with defendant. Furthermore, neither of these women testified at the trial of this matter.

mately the same time as Ms. Vance. As Ms. Vance was leaving the parking lot to join the picketers, Mr. Warner pushed her back toward the company parking lot and instructed her to go into work. Mr. Warner then entered the plant and Ms. Vance removed her car from the parking lot prior to joining the picket line.

On that same morning, a number of union and management officials were present at the plant by 6:30 a.m. Mr. Gaydosik, the union president, arrived at the plant at approximately 6:15 a.m. Ms. Lucas and Mr. Hlad, union stewards, were both at the plant by 6:00 a.m. Mr. Huffman, a supervisor of iron line employees, arrived at the plant at approximately 6:30 a.m. At that time, Mr. Huffman was able to identify those picketing employees who worked on the iron line including plaintiffs Hunter, Vance and Campbell, as well as Ms. Murgatroyd and Ms. Womac.

When Mr. Warner, the plant manager, arrived at about 7:00 a.m., he instructed management supervisors to begin collecting the names of those on the picket line. Mr. Walters and Mr. Huffman, both supervisors on the iron assembly line, went outside and returned with the names of women who worked on the iron assembly line. Neither Walters nor Huffman could recall seeing any men on the picket line; however, both testified that they noted the names of these women merely because they could identify these women because they worked on the iron assembly line.[5] Both men testified that there were a large number of people milling around outside the entrance to the plant. Neither Mr. Huffman nor Mr. Walters could recall any activity by the plaintiffs on the morning of the 10th that distinguished them from the rest of the pickets.[6]

5. The Court notes that in addition to the statements of Mr. Walters and Mr. Huffman, a number of other supervisors submitted statements to management concerning their observations on the first morning of the strike. The statements of these supervisors were admitted at trial solely for their notice giving function and not for the truth of those matters they assert. Three of these supervisors, Mr. Dodd, Mr. Williams and Mr. Foraker make reference to Marlene Campbell in their statements but do not refer to any of the other plaintiffs. The Court notes at this point that it views management's reliance on these statements when making its decision to discharge these plaintiffs with skepticism for a number of reasons. First, all these statements refer to a large group of picketers and yet the only person named is Marlene Campbell.

Second, the tone and contents of these statements suggest that for some unexplained reason the supervisors seemed to have been concentrating on the activities of Marlene Campbell. For example, Mr. Dodd states that he observed Marlene Campbell distributing donuts to picketers. In the midst of a wildcat strike with hundreds of employees picketing and physically blocking people's entrance to a plant, it seems unfathomable that a supervisor would single out an employee who was merely distributing donuts. Mr. Dodd's statement goes on to note that "[to] my knowledge, this was the only time that I saw her at the warehouse picket site." Mr. Dodd's statement, which specifically calls attention to his *failure* to observe any additional activity on Ms. Campbell's part, strikes this Court as suspicious. It strongly suggests that Ms. Campbell may have been the object of suspicion, without justification, prior to management's request that

Mr. Dodd and other supervisors observe and report on the activities of the strikers.

The Court views with suspicion the singling out of Marlene Campbell in the statements of these supervisors for additional reasons. At least with respect to the statements of Mr. Williams and Mr. Foraker, it appears that their references to Marlene Campbell as a spokesman or ringleader are not based on any personal observation but rather are derived from statements they allegedly received from unknown and unnamed employees. There is some serious question about the reliability of these statements, therefore.

Finally, the evidence does not disclose that any attempt was made to investigate the allegations against Campbell or verify the statements of these supervisors, which are based largely if not wholly on hearsay. The Court has substantial difficulty giving credence and weight to these statements and views with some suspicion defendant Westinghouse's attempt to rely on these statements in claiming it in good faith believed that Campbell had instigated the wildcat strike which occurred on September 10. (*See* defendant's Exhibits W, X, Y).

6. It should be noted that both plaintiff and defense witnesses testified that pictures and/or films were taken of the strike activity on the morning of the 10th by Joe Stahl, a process engineer, and Jim Campbell, an industrial engineer employed by Westinghouse. Plaintiffs requested that they be provided copies of those pictures or films but defendants claim not to know the whereabouts of any pictures. No pictures were produced at trial.

At approximately 7:30 a.m. on the morning of the 10th, Mr. Welsh, the plant's personnel manager, arrived. When Mr. Welsh arrived at the plant, he observed a mass of about 100 people milling around outside the plant although he could not recall seeing any men. Mr. Welsh then went inside the plant and also instructed supervisors to gather information about the strike and to prepare statements concerning their observations.[7] Mr. Welsh himself kept a running narrative of the events as they occurred from the first day of the strike until its end. *See* defendant's Exhibit E.

Sometime after 7:00 a.m. on the first morning of the strike, Mr. Warner and Mr. Gaydosik went outside the plant to speak to the strikers. Plaintiff Vance was not present when the union president and plant manager spoke to the strikers. Plaintiff Hunter recalled seeing Mr. Gaydosik and Mr. Warner speaking to the employees outside the plant on the morning of the 10th but stated that she could not hear what was said. Ms. Campbell recalled hearing Mr. Gaydosik tell the strikers at that time that the strike was illegal. Mr. Warner and Mr. Gaydosik both appealed to the workers to come back to work.

Two of plaintiffs' witnesses, Mr. Wayne Red and Mr. Ron Haga, male employees on the picket line, testified that they informed Mr. Warner at that time that the buffers were dissatisfied with working conditions and that they would not go back to work until those conditions were remedied. Mr. Welsh's records of the events of the strike indicate that employees were upset because they discovered that the company had never ordered a ventilation system which it had promised to order. Defendant's Exhibit E. After Mr. Warner and Mr. Gaydosik spoke with employees, and the employees refused to return to work, Mr. Warner and Mr. Gaydosik went back inside the plant. The employees continued to picket. The consensus among management and union representatives seemed to be that there

was a mass of people milling around outside the plant; some held signs, others did not; traffic was backed up on Hope Avenue. Mr. Hlad and Mr. Witte, a representative of the international union, both testified that it did not appear that anyone was in charge, or that there were a coherent set of demands.

On the first morning of the strike, after Mr. Warner and Mr. Gaydosik spoke to employees, Ms. Campbell testified that she took a fellow employee home and that upon returning to the plant, she was instructed where to picket by Myrna Valentine. Ms. Campbell also testified that for the duration of the strike she provided fellow employees with lounge chairs and coffee. Ms. Hunter testified that she was directed, although she could not remember by whom, to picket at the rear entrance to the plant.

On the first day of the strike, Ms. Vance testified that she was directed by Ms. Valentine to go to the company warehouse where she carried a picket sign. Ms. Franks, an employee in the machine shop at Westinghouse and a rebuttal witness for the plaintiffs, testified that Ms. Valentine directed both she and Ms. Vance to go to the company warehouse at about 8:00 a.m. Ms. Franks further testified that a fellow employee, Ed Benner, drove Ms. Vance and herself to the warehouse.

In the afternoon on September 10, 1969, plaintiff Vance went to the railroad track area near the Westinghouse plant and continued to carry a picket sign. Ms. Vance remained at this location until she left the plant at approximately 3:00 p.m. on the first day of the strike. All the plaintiffs left the plant at approximately 3:00 p.m. on the first day of the strike and returned the next day and continued picketing.

Two male employees, Wayne Red and Ron Haga, employed as material handlers at the Byesville plant, testified that they also picketed on the first day of the strike. Mr. Haga further testified that no one organized the strike and that everything occurred spontaneously. Mr. Haga further

---

7. *See* defendant's Exhibits R, S, T, U, V, W, X, Y. (statements by supervisors admitted solely for the notice giving function). *See also* discussion of those statements in note 5, *supra.*

testified that mostly men picketed at the plant in the evenings. Moreover, Mr. Haga testified that following the illegal work stoppage, in May 1970, he was interviewed for a promotion. At that time, Mr. Welsh, still personnel director for Westinghouse, stated to Haga that he knew that Mr. Haga had been at the "head of the pack." Mr. Haga nonetheless received this promotion and became a salaried production planner in the summer of 1970.

Wayne Red also testified that he took part in the strike activities on the morning of the 10th. He testified that when he arrived at the plant at 6:45 a.m. there were a number of people, both men and women, picketing outside the plant. Mr. Red further testified that he made his van available to transport strikers to the various picket locations and also provided coffee for the strikers.

During that first day of the strike, management and union officials met in an attempt to resolve the strike as quickly as possible. Sometime on the 10th, Mr. Welsh was informed by Mr. Gaydosik, the union president, that three women were instigators of the strike. Mr. Gaydosik named Ms. Vance and Ms. Campbell. Two supervisors, Mr. Foracker and Mr. Williams, also named Ms. Campbell as a participant in the strike on the 10th.[8] *See* defendant's Exhibits Y and X. Mr. Gaydosik also indicated to Mr. Welsh that he knew the strike was illegal and that the union was in no way involved in the strike. Overall, as of the first day of the strike, management had very little information concerning the origins of this strike.

The next day, on September 11, 1969, the strike continued. Two to three hundred people of both sexes appeared outside the plant on September 11, 1969. Sometime during the 11th, Mr. Welsh observed a male employee, Mr. Bill Swank, jump on a car attempting to enter the company parking lot. Mr. Swank proceeded to tear off the car's windshield wipers and antenna. Eventually, Mr. Swank was thrown from the car while attempting to block its entry

to the parking lot. Criminal charges were eventually filed against Mr. Swank concerning this incident although no disciplinary action was taken by the company against him.

On the second day of the strike the company continued to gather information concerning this illegal work stoppage. There was substantial conflict in the information being received by the company, however.

Two meetings with first and second shift employees, who reported to work on the 11th, and with local union officials were held inside the plant on that day. During the course of these meetings, a number of employees accused the union of supporting the work stoppage. Following these accusations, Mr. Welsh made attempts "to divert this conversation and change the course of discussion ... [since these accusations were] very embarrassing to the local union president and the board members." Defendant's Exhibit E. At no time did management question these employees about the names of the union representatives involved in encouraging the strike or the extent of the involvement of these union officials. The union president also did not question these employees about the union's involvement. Rather, Mr. Gaydosik continued to deny any union involvement, insisting that Vance and Campbell instigated the strike.

At the end of the second day of the strike, there was absolutely no information implicating Judith Hunter in organizing the strike activity. The strike continued throughout the day of the 11th and management made no effort to discover the extent of union involvement.

On September 11, 1969, management put in motion the procedure necessary to get an injunction against employees on the picket line. A total of 44 employees, including 19 male employees, were named and served with the injunction on September 12, 1969. Management also notified Westinghouse's home office that an illegal strike was in progress. Mr. Welsh testi-

---

**8.** *See* discussion of these accusations at note 5, *supra.*

fied that once the home office was notified of the illegal work stoppage, it was necessary to discipline certain employees, that is to "make examples" of certain employees, so that future illegal activity would not occur at the Byesville plant.

In addition, at some time during the course of this strike, union officials, who became increasingly concerned when employees did not return to work, decided to hold a meeting with employees on Saturday, September 13.

The strike activity continued throughout the day on the 12th. On the 12th, Mr. Welsh's records note that there were incidents of employees throwing tomatoes and eggs at a Sheriff's vehicle as well as cars attempting to enter the company parking lot. None of the plaintiffs were involved in any of these incidents.

By Friday, September 12, 1969, the international union had been notified of the illegal work stoppage.

On September 12, 1969, Mr. Welsh received a call from Mr. Witte, a representative of the international, and it was agreed that a "secret" meeting should be held between Messrs. Welsh, Witte, Warner and Gaydosik. Defendant's Exhibit E at p. 6. At this meeting, the reasons for the strike and the possibility of disciplinary action against those participating in the strike were discussed. At that time, Mr. Welsh informed Mr. Witte that "it was management's feeling that [the strike] was caused by a small group of dissident females ..." Defendant's Exhibit E, p. 6. The union officials present did not question management concerning this conclusion nor was the issue of union involvement in the strike ever raised.

On Saturday, September 13, the local union held a meeting with the employees at the Byesville city park. Plaintiff Hunter did not attend that meeting, though she later heard that all employees were to report back to work on Monday. The evidence is unclear as to whether plaintiffs Campbell or Vance attended that meeting, though they also reported back to work on Monday, September 15.

At that union meeting, Mr. Witte, the international representative, informed the employees in attendance that the strike was illegal and that the employees should report to work on Monday, September 15. Other details concerning that meeting are not available to the Court.

On late Saturday evening, following this union meeting, Messrs. Warner, Welsh and Muehlig, the director of industrial relations from Westinghouse's home office, met with Mr. Witte at his hotel. This meeting was also "secret." At this meeting, the parties apparently agreed that there were no "real" reasons for the work stoppage and that the strike "was the result of several female employees who decided to take matters into their own hands." Defendant's Exhibit E at 8. Apparently everyone agreed that disciplinary measures were needed in order to prevent such incidents from recurring in the future. Union encouragement of the strike was not discussed, nor was any mention made of the involvement of male employees in the strike.

On Sunday, September 14, there were no pickets at the plant. Employees were notified by their foreman that they were to report to work on Monday. On September 14, Messrs. Warner, Welsh and Meuhlig made the decision to suspend seven women employees including: Marlene Campbell, Myrna Valentine, Wilma Womac, Anna Thompson, Carol Murgatroyd, Judith Hunter, and Shirley Vance.

At that point in time, management had no information implicating Ms. Hunter in the instigation of the strike other than the fact that she was one of the early picketers. Management did have statements from supervisors and Mr. Gaydosik implicating Campbell and Vance as instigators of the strike.[9] However, management also

---

9. As has already been noted, the statements of supervisors implicating plaintiffs are of questionable reliability and trustworthiness. *See* discussion, note 5, *supra.* In addition, given the fact that the union had been accused of actively encouraging the strike, the union president's

had information, which they failed to pursue, implicating the union in the strike. This information concerning the union's involvement also raises questions about the reliability and trustworthiness of the union president's statements implicating some of the plaintiffs. Moreover, at this time, management had information about, as well as personal knowledge of, activities of male strikers including Ron Haga, Wayne Red and Bill Swank which were of comparable, if not greater seriousness, to the activities of plaintiffs at the strike scene.

On Monday morning, the seven women already named, including the plaintiffs, were notified that they were being suspended "subject to discharge." Management representatives testified that this was routine procedure because it allowed the company a further opportunity to investigate prior to discharging employees.[10]

On that same morning, Mr. Witte arrived at the plant at approximately 8:00 a.m. and he along with local union officials met with Mr. Welsh and explained that the employees were very upset about the discharge of Myrna Valentine. Ms. Valentine was thereafter reinstated. No similar appeal was made on behalf of the other six women suspended.

Sometime after the initial suspension of the remaining six women, a number of conversations and meetings took place although the details leading up to and surrounding these meetings and conversations are somewhat unclear. Initially, immediately after being notified of their suspensions, it appears that all the women requested that the union file grievances on their behalf. The circumstances surrounding these requests and the dates on which they were made cannot be discerned from the evidence adduced at trial. In addition, sometime after their discharges each of these women was contacted by either Mr.

Welsh or Mr. Gaydosik, or conversely each woman who was suspended contacted Mr. Welsh or Mr. Gaydosik. This factual dispute concerning who contacted whom is of no import.

With regard to those women who were eventually discharged, who are not plaintiffs here, it appears that all three women, Carol Murgatroyd, Anna Thompson and Wilma Womac, spoke to Mr. Gaydosik and Mr. Welsh in the period of time following their suspensions but prior to their discharges. Ms. Murgatroyd, who met with Mr. Gaydosik and Mr. Welsh on September 16, made a plea for her job and also stated that Shirley Vance and Marlene Campbell told her that a strike was to occur, as well as what to do during the strike. Murgatroyd also stated, however, that she believed the union was backing the strike.

Anna Thompson met with Mr. Welsh and Mr. Gaydosik on September 19. Ms. Thompson stated that she believed that the union was backing the strike. Following the meeting with Thompson, Gaydosik confirmed that several union officials including Ken Bates, a member of the executive board, and Norma Lovett, encouraged the strike. Mr. Bates worked in the machine shop along with Mr. Gaydosik and Mr. Vincent, who were also members of the executive board. None of the union officials who allegedly encouraged the strike were suspended or disciplined in any way.

At trial, Mr. Gaydosik denied ever naming any union officials as instigators of the strike. Mr. Welsh's record of the events of the strike, however, and additional evidence adduced at trial, convince the Court that the names of union officials responsible for encouraging the strike came to the attention of management no later than September 19. In addition, the Court notes that at the time of trial Mr. Gaydosik was in poor health and could not recall many of the

---

statements implicating the plaintiffs are also of questionable reliability.

**10.** Further information concerning the origins of the strike did come to light in the interim period between the time plaintiffs were suspended and the time they were discharged.

More specifically, management received further information confirming the fact that members of the union encouraged the strike. Yet despite this information, six women and no men were suspended and subsequently discharged.

details surrounding the illegal work stoppage.

It is also of interest to the Court that while Mr. Welsh's report acknowledges that perhaps as many as four union officials were involved in and actively encouraged the strike, that report leaves blank the spaces where the names of those union officials should be recorded. When questioned about this omission at trial, Mr. Welsh simply stated that he was concerned that his report might fall into the "wrong hands." No further elaboration of what was meant by the term "wrong hands" was given by Mr. Welsh.

On September 20, 1969, Mr. Gaydosik and Mr. Welsh met with Wilma Womac. In addition to implicating Campbell and Vance in the organization of the strike, Ms. Womac stated that at least two union officials told her that the strike would be backed by the union.[11] Ms. Womac went on to note that Marlene Campbell had also been led to believe that the strike would be backed by the union.

Based on the conversation with these three women, the defendant, Westinghouse, knew prior to discharging the plaintiffs that union officials had backed the strike. Mr. Welsh's report goes so far as to conclude that "[i]t would appear that certain elected union officials actively encouraged the stoppage and made statements to the effect that the union was, in fact, in back of and/or supporting the stoppage and the people who participated in it." Defendant's Exhibit E at 15.

Moreover, the Court notes that all three women, Womac, Thompson and Murgatroyd, denied having instigated or organized the strike which took place on September 10. Nonetheless, these women were discharged along with the plaintiffs for having instigated or organized the strike.[12]

Despite the statements from Womac, Thompson and Murgatroyd implicating the union in organizing the strike, defendant Westinghouse took no action against the union or any union officials. Rather during this alleged investigation period following suspension but preceding discharge of these plaintiffs, defendant did nothing to investigate the involvement of union officials and proceeded to discharge these women. On September 26, 1969, nearly two weeks after the illegal work stoppage, plaintiffs were informed by letter of their discharges.

In the time between their suspensions but prior to their discharges, there is evidence that either Mr. Gaydosik or Mr. Welsh contacted some of the plaintiffs in an effort to have them make statements concerning their involvement in the strike. Plaintiff Hunter recalled being contacted by Mr. Welsh but could not recall when she was contacted. Ms. Hunter recalled Mr. Welsh telling her that she was being disciplined because he knew her name. No other details surrounding Hunter's conversation with Welsh were adduced at trial.

Ms. Campbell did not testify as to whether she was contacted by Mr. Welsh or Mr. Gaydosik, and the Court can draw no conclusions in that regard. Ms. Vance, however, testified that almost immediately following her suspension she received a telephone call from Mr. Welsh asking her to come into the plant to meet with him. Ms. Vance testified that at that time, Mr. Welsh

---

11. Once again, Mr. Welsh's report concerning his meeting with Ms. Womac leaves blanks where the names of the union officials named by Ms. Womac should appear.

12. The company claims that it relied in part upon the statements made by Womac, Thompson and Murgatroyd in making a decision to discharge the plaintiffs for instigating the strike. The Court has some difficulties with defendant's contention. First, the company, as has already been noted, did not follow up on these women's statements concerning union involvement in organizing the strike. Moreover, if the company chose to rely on the statements of these women as to who instigated the strike, the Court has difficulty understanding why the defendant proceeded to discharge Womac, Thompson and Murgatroyd, when these three women stated categorically that they did not instigate the strike. These facts coupled with additional facts as set forth in this opinion persuade the Court that the defendant's proffered justification for discharging the plaintiffs, *i.e.*, that plaintiffs instigated this strike, is unworthy of credence.

stated that he wanted her to "sign some paper" to clarify the involvement of herself and others in the strike. Plaintiff Vance refused to meet with Mr. Welsh. During this telephone conversation, Mr. Welsh went on to state that he knew personnel directors at other plants and would give plaintiff Vance a job recommendation to help her find future employment if she would consent to make a statement about the strike. Ms. Vance still refused to meet with Mr. Welsh or to make any statement.

Following her conversation with Mr. Welsh, Ms. Vance received a telephone call from Mr. Gaydosik. Mr. Gaydosik also attempted to persuade plaintiff Vance to meet with Mr. Welsh and himself for the purpose of giving a statement about the strike. Mr. Gaydosik told her at that time that she would have difficulty finding another job if she did not consent to give such a statement. Ms. Vance stated that she would not implicate others in the strike activity and would not give any statement to Mr. Welsh. The Court notes that Messrs. Welsh and Gaydosik denied making phone calls to any of the discharged women; however, the Court concludes that Ms. Vance's testimony with respect to these phone calls is believable.

As has already been noted, following their suspensions, all three plaintiffs received letters informing them that they had been discharged. *See* plaintiffs' Exhibit VII. All three women received the identical letter. These discharge letters, dated September 26, 1969, stated that plaintiffs' indefinite suspensions had been changed to discharges "based upon [their] most recent misconduct and past record."

When questioned about the reasons for plaintiffs' discharges, Mr. Welsh testified that the letters' reference to "most recent misconduct" referred to plaintiffs' violation of company rules and regulations forbidding the willful hampering of production. *See* plaintiffs' Exhibit VI, ¶ A, # 6. Plain-

tiffs' participation in the work stoppage was considered a violation of this rule.

With regard to the discharge letters' reference to "past record," Mr. Welsh admitted that none of the plaintiffs had prior disciplinary records. However, defendant contends the discharge letters sent to plaintiffs were standard letters used when discharging an employee. Mr. Welsh also noted, however, that he was investigating reports that Ms. Vance and Ms. Campbell were married to union stewards. Mr. Welsh further admitted investigating allegations that plaintiff Vance had had a nervous breakdown. While Mr. Welsh conceded that these facts were not relevant to the decision to discharge, he insisted that investigation of these matters was part of the routine investigation procedure employed by the company in discharge cases. Finally, while Mr. Welsh, when pressed, conceded that there had never been any criticism of these women's work, he continued to insist that the discharge letters' reference to "past misconduct" was simply cautionary.[13]

Following their receipt of these discharge letters, plaintiffs continued to press the union to file grievances on their behalf. Mr. Gaydosik filed a grievance on September 24, 1969, on behalf of Ms. Campbell and Ms. Hunter concerning their suspensions and eventual discharges. On October 1, 1969, Mr. Gaydosik also filed a grievance on behalf of Ms. Vance. *See* plaintiffs' Exhibit 2a–c. Thereafter, the company denied the grievances on October 1 and October 11, 1969, respectively.

Sometime in October of 1969 Ms. Campbell met Mr. Gaydosik in a parking lot. At that time, Mr. Gaydosik informed Ms. Campbell that the company and the union agreed on who should be discharged, but that he would proceed with Campbell's grievance if she wished to pursue it. Ms. Campbell told Mr. Gaydosik that she did

---

13. The Court is at a loss to understand why the defendant would state that these women were being discharged for "past misconduct" when there was no evidence of past misconduct unless plaintiffs are correct in their assertion that the language was included by the company in the hope that it could "come up with something" about the past records of these women which would justify its decision to discharge these women.

want to proceed with her grievance.[14] Shortly thereafter, although no specific date was mentioned at trial, plaintiff Vance called Mr. Gaydosik and complained that "he sold [them] down the drain." Mr. Gaydosik responded by saying the union and the company agreed that the plaintiffs should be used as examples. Mr. Gaydosik could not recall either the conversation with Ms. Campbell or Ms. Vance.

A third-step grievance meeting was eventually scheduled for January 20, 1970. Immediately prior to this meeting, plaintiffs Vance and Campbell were telephoned by Mr. Witte, the international representative, who arranged a meeting with the plaintiffs, at the local Holiday Inn. Plaintiffs Vance and Campbell met with Mr. Witte at that time. Mr. Witte could not recall this meeting, and no information concerning this meeting was received in evidence.

Thereafter, pursuant to the terms of the collective bargaining agreement, Jt. Exhibit II, Art. VII, a third-step grievance meeting was held on Tuesday, January 20, 1970. Present at the third-step meeting were Paul Witte, representative of the international union; Frank Gaydosik, president of Local 2196; William Hall, vice president of Local 2196; Rose Lucas, recording secretary for Local 2196; H.F. Warner, plant manager; C.A. Welsh, industrial relations manager; and each of the plaintiffs, Marlene Campbell, Judith Hunter, and Shirley Vance. The minutes of this third-step meeting were kept by the recording secretary.

At that meeting, it is clear that no mention was ever made of union support for the strike. The plaintiffs were each given an opportunity to state their positions at this meeting. Specifically, plaintiffs claimed that they did not encourage the strike and that they did nothing more or less than other employees. Plaintiffs insisted throughout the grievance procedures that they merely honored the picket line.

Following the third-step meeting, the executive board of the union met and voted on whether to take plaintiffs' grievances to arbitration. Ironically, it was Kenny Bates, the executive board member accused of having encouraged the strike, who moved to drop plaintiffs' grievances and not to take them to arbitration. After Mr. Bates' motion, the executive committee voted not to take plaintiffs' grievances to arbitration.

Prior to voting, no member of the executive board questioned the wisdom of the company's decision to terminate these women despite plaintiffs' allegations that the union encouraged the strike. The possibility of sex discrimination and/or retaliation were not discussed prior to voting on whether to take plaintiffs' grievances to arbitration. In support of their decision not to take plaintiffs' grievances to arbitration, the executive board simply accepted the company's position that the plaintiffs had violated company rules which forbade the willful hampering of production.

In February 1970, a third-step answer to plaintiffs' grievances was prepared. See defendant's Exhibit A. Finally, in March 1970, plaintiffs were informed by letter that the executive board had voted not to pursue resolution of plaintiffs' grievances through arbitration. See defendant's Exhibit D.

Following the plaintiffs' discharges, Westinghouse continued, until the Byesville plant was purchased by Scovill in 1972, to employ and hire persons as assemblers and inspectors on the iron assembly line. At this same time, all the plaintiffs filed timely charges with the Equal Employment Opportunity Commission (EEOC). The commission then conducted an investigation of plaintiffs' allegations. See Jt. Exhibits III, IV and V. During the course of the EEOC's investigation of plaintiffs' allegations of discrimination, Westinghouse

---

**14.** It appears that all the plaintiffs also wrote to Mr. Blankenship of the international union. The contents of those letters, as well as the international's response to those letters, are not in evidence. The Court does note, however, that Mr. Witte, a representative of the international, did have some further involvement in the processing of these women's grievances.

was asked to provide the EEOC with documents relevant to that investigation.

*See* plaintiffs' Exhibit 24. In response to this request by the EEOC, Mr. Welsh agreed to provide the EEOC with the information requested. *See* plaintiffs' Exhibit 25. Thereafter, Mr. Welsh submitted affidavits to the EEOC summarizing the statements made to him by the three women discharged who are not plaintiffs here, Ms. Murgatroyd, Ms. Womac and Ms. Thompson. *See* plaintiffs' Exhibits 27, 28, 29.

With regard to the affidavits submitted by Mr. Welsh to the EEOC, the Court notes that the summaries of the statements of these women conspicuously omit certain information concerning the strike. More specifically, Welsh's summaries delete all references to union encouragement of the strike. In addition, Mr. Welsh altered Ms. Womac's original statement in his affidavit. The summary of Womac's statement submitted by Mr. Welsh to the EEOC reads as if Ms. Campbell was the person who informed her that the union was backing the strike. *See* plaintiffs' Exhibits 27, 28, 29.

In January of 1976, the EEOC issued determinations that there was reasonable cause to believe that the plaintiffs were discharged because of their sex in violation of Title VII. *See* plaintiffs' Exhibits 31, 32. In May of 1976, plaintiffs Vance, Campbell and Hunter received notice of their right to sue Westinghouse, Scovill Manufacturing and Local Union 2196. *See* plaintiffs' Exhibits 33–41. Thereafter, this litigation was commenced.

In the interim, from the time this suit was commenced, all three plaintiffs sought employment. Initially, all the plaintiffs attempted to collect unemployment benefits but these benefits were denied. Following the denial of unemployment benefits, and in an attempt to find employment, all the plaintiffs utilized the services of the Ohio Bureau of Employment Services; all the plaintiffs read the classified ads in newspapers; and all the plaintiffs contacted and filed applications with various plants in the Byesville area.

Each of the plaintiffs eventually did find employment. The Court, in the following paragraphs, will survey the employment histories of each of the plaintiffs following their discharges. Each of the plaintiffs filed applications with employers in the Byesville area who had work comparable to that of Westinghouse. The evidence at trial further shows that all three plaintiffs filed applications with NCR, March Electric and Champion Spark Plugs, as well as other plants in the Byesville area. None of the plaintiffs were hired by any of these plants. The Court notes, however, that the three women discharged, who are not plaintiffs here, were all hired by March Electric during the months of December 1969 and January 1970. The Court can draw no inference from the fact that Ms. Womac, Ms. Thompson and Ms. Murgatroyd found employment at the same plant shortly after their discharges.[15]

Immediately after her discharge, plaintiff Hunter was unable to secure employment. From August 1971 until January 1972, Hunter removed herself from the job market in order to adopt a child. Thereafter, plaintiff Hunter continued to seek employment. During the course of her search for employment, plaintiff filed applications with Westinghouse's successor, Scovill. In 1973, plaintiff Hunter worked for Star Plastics for two weeks, then voluntarily

---

**15.** The plaintiffs ask the Court to conclude that the fact that women who made statements to management were able to find employment while the plaintiffs were not, supports their allegation that the plaintiffs were blackballed by management. The defendant asks the Court to conclude that the fact that other discharged employees found employment while plaintiffs could not proves their contention that plaintiffs did not seriously seek employment following their discharges. Neither position appeals to this Court as being the more likely explanation. Rather, the Court believes that the most plausible explanation for plaintiffs' failure to find employment, while other discharged employees did not suffer a similar fate, was the fact that plaintiffs noted on their applications for employment that they had been discharged from Westinghouse for participation in a wildcat strike while those discharged employees who were hired omitted all reference to their employment at Westinghouse.

quit that job. From 1973 to 1975, she was unable to find employment. In 1975, Hunter was employed briefly at A & J Cleaning before being laid off. In 1975, she obtained seasonal employment as a maid at Ohio Inns in the Salt Fork area. Plaintiff Hunter eventually obtained full-time employment with Ohio Inns and is still employed by them at the present time. Copies of her wage and tax statements for the relevant period were received in evidence. *See* plaintiffs' Exhibits 4(a)–4(j).

Ms. Campbell also diligently sought employment following her discharge from Westinghouse. In July of 1970, plaintiff Campbell became employed by Elby's Restaurant as a waitress. Ms. Campbell left that job in 1971 and obtained a job as a hostess at the Carousel Club in Cambridge, Ohio. In October 1972, Campbell voluntarily left her hostessing job when she became engaged to be married. Following her marriage in 1973, plaintiff Campbell has worked part-time for her husband's business. Plaintiff Campbell receives no compensation for her work in this regard. Since her marriage plaintiff Campbell has not actively sought employment. Copies of plaintiff's wage and tax statement for the relevant period were received in evidence. *See* plaintiffs' Exhibits 42, 43, 44(a)–44(j). In addition, plaintiff Campbell suffered physical maladies which required her to be hospitalized during this period in time. Copies of hospital and medical bills were also received in evidence. Plaintiffs' Exhibit 45. At present, plaintiff Campbell continues to work for her husband without remuneration.

Finally, plaintiff Vance also made attempts to secure employment following her discharge from Westinghouse. In 1970, plaintiff Vance obtained seasonal employment at Chal's Restaurant as a waitress. In 1971, plaintiff Vance also worked for Chal's during the summer as a waitress. In 1972, plaintiff Vance was hospitalized and did not work at all due to her illness. In 1973, plaintiff Vance worked briefly for approximately two to three months at Plastic Fabricators. After leaving Plastic Fabricators, plaintiff Vance collected unemployment until she again obtained employment at Chal's. During the summers of 1974 and 1975, Ms. Vance was again employed as a waitress at Chal's. In 1975 Ms. Vance also worked briefly at 1–Hour Cleaners and an LK Restaurant in Cambridge, Ohio. Copies of Vance's wage and tax statements for these years and subsequent years were received in evidence. *See* plaintiffs' Exhibits 49–50.

In 1977, plaintiff Vance moved with her family to Nashville, Tennessee, in part because of her inability to find work in the Cambridge area. While in Nashville, plaintiff Vance secured employment with Aladdin Industries. She left her job at Aladdin for a higher-paying job at Maremont, Inc. Plaintiff Vance remained employed at Maremont until 1979 when, in anticipation of their plants' closing, plaintiff Vance and her husband moved to Memphis, Tennessee. In 1980, plaintiff Vance worked briefly at Grisham Corporation in Arlington, Tennessee. She was eventually laid off from that job and collected unemployment benefits for the remainder of that year. In July 1981 until July 1982, Ms. Vance obtained employment at Dow Corning Wright in Arlington, Tennessee. In July 1982, plaintiff Vance and her husband moved to Greenwood, Mississippi, following the closing of the plant where Mr. Vance was employed. From July 1982 until present, Ms. Vance has been unable to find employment.

Defendant Westinghouse suggests that plaintiffs did not exercise reasonable diligence in seeking employment following their discharges, and therefore plaintiffs have failed to satisfy their mitigation requirement. In support of this contention, defendant notes that at all times since plaintiffs' discharges, local plants in the Byesville area have hired unskilled labor. While it is true that the personnel directors of March Electric and NCR did testify that unskilled labor was hired during this period, those witnesses also testified that they would give consideration to the fact that an applicant had been discharged from a previous job for participation in a wildcat strike

when making hiring decisions. Therefore, the Court cannot conclude that the plaintiffs were not diligent in seeking employment based upon the fact that local plants refused to hire them.

In addition, defendant charges that plaintiffs failed to meet their duty to mitigate insofar as they, at various times, voluntarily ceased looking for comparable employment. In regard to plaintiff Hunter, she is not entitled to recover damages for that period of time in which she ceased seeking employment in order to adopt a child. In addition, plaintiff Campbell is not entitled to recover damages for that period of time following her marriage since she made no attempts to secure employment during that time. In all other respects, the plaintiffs satisfied their duty to mitigate by making reasonable and diligent efforts to secure employment following their discharges from Westinghouse.

## II

### A. *Allegations of Disparate Impact*

■ Plaintiffs attempt to argue that the disparate impact analysis contained in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) is applicable to the facts of this case. More specifically, plaintiffs allege that defendant's invocation of the company rule prohibiting the willful hampering of production in making its discharge decision had a disparate impact on women. This Court believes that this case is more properly viewed as a disparate treatment case and that the appropriate analysis, therefore, is that contained in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Unlike disparate treatment cases, disparate impact cases are those which attempt to eliminate discriminatory practices and devices which have fostered or perpetuated stratified job environments to the disadvantage of members of a protected class, *i.e.*, built-in headwinds. *Griggs v. Duke Power Co.*, 401 U.S. at 429–31, 91 S.Ct. at 852–53. What is being challenged in disparate impact cases, therefore, is some arbitrary or artificial device or practice which operates so as to invidiously discriminate against members of a protected class.

Unlike cases where a plaintiff challenges a facially neutral employment policy or practice which has a disparate impact, this case is not a case involving testing devices, *Griggs, supra*, at 424, 91 S.Ct. at 849; *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 412–13, 95 S.Ct. 2362, 2369, 45 L.Ed.2d 280 (1975); nor is this a case involving particularized requirements such as height and weight specifications, *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). This Court simply cannot conclude that in the course of a wildcat strike defendant's one-time invocation of a company rule prohibiting interference with production is the type of situation to which the disparate impact analysis of *Griggs* and its progeny was meant to apply. Under no interpretation of the facts in this case can this Court conclude that the company rule invoked by defendants to support its decision to discharge plaintiffs was an "artificial, arbitrary or unnecessary barrier" to equal employment opportunities. *See Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575–79, 98 S.Ct. 2943, 2948–50, 57 L.Ed.2d 957 (1977).

At this point, the Court also notes that plaintiffs also argue that defendant had a "pattern or practice" of discriminating against women. More specifically, in addition to the illegal sex discrimination alleged to have occurred in the discharge of plaintiffs, there are allegations that defendant had a pattern or practice of discriminating against women in terms and conditions of employment, including pay, promotions and overtime assignments. The Court concludes that the evidence in this case is simply not sufficient to make out even a *prima facie* case of a pattern or practice of discrimination as such cases are defined under *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). *See also Furnco Construction*

*Corp. v. Waters*, 438 U.S. 567, 575, 98 S.Ct. 2943, 2948, 57 L.Ed.2d 957 (1978).

Plaintiffs' discharges alone are not sufficient to establish a *prima facie* case under *Teamsters* even though no males were discharged. The discharges in this case for a violation of a company rule prohibiting interference with production followed a wildcat strike. There is no evidence that this company rule had ever been invoked prior to this strike. A total of 346 employees participated in this strike. In an attempt to enjoin the strike, 44 employees were named as defendants; 14 of those named were men. Six women were terminated following the strike; no men were terminated. Based on this evidence, plaintiffs seek to characterize the company's action in discharging only women as evidence of a *prima facie* case of a pattern or practice of discrimination. This evidence falls far short of the level of statistical proof required when making out a *prima facie* case of a pattern and practice of discrimination. *See Grano v. Dept. of Development*, 637 F.2d 1073, 1078 (6th Cir.1980).

Plaintiffs further allege that a pattern or practice of discrimination is evidenced by the company's treatment of women with regard to promotions, pay and overtime. There is a dearth of statistical or other evidence on these questions. The fact that no women served as supervisors or held jobs in higher labor grades does not demonstrate[16] a pattern or practice of discrimination absent some evidence concerning the number of job openings over a period of time, and the number and availability of qualified women as compared to qualified men. *Id.* at 1078.

Moreover, the quantum of evidence adduced at trial falls far short of what is required to make out a case of a pattern or practice of discrimination against women insofar as the assignment of overtime or rate of pay are concerned. Absolutely no evidence of salary differences was introduced at trial. The only evidence of discrimination in the assignment of overtime was plaintiff Vance's testimony that a male employee was assigned overtime that should have been assigned to her. Based on the insignificant quantity and quality of evidence, the Court has no basis for finding a pattern or practice of sex-based discrimination.

In conclusion, therefore, as the Court has already noted, the proper approach to this case is the disparate treatment analysis contained in *McDonnell Douglas*.

### B. *Allegations of Disparate Treatment*

It is now well established that a person charging disparate treatment on account of sex must prove "by a preponderance of the evidence that the defendants intentionally discriminated against [him or her]." *Grano v. Dept. of Development*, 637 F.2d 1073, 1081 (6th Cir.1980). *See also Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *Carter v. Petry*, No. C–2–77–89, Opinion and Order (S.D. Ohio, June 29, 1982) (Duncan, J.). Proving discriminatory intent by direct evidence, however, is an onerous, indeed sometimes impossible, task. Therefore, it is incumbent upon a court to analyze allegations of discrimination in light of all the surrounding facts and circumstances of the case before it. *Grano, supra,* at 1081 n. 7. To facilitate a trial court's analysis of disparate treatment claims, the Supreme Court has developed a three-part test to be used in such cases.

First, the plaintiff has the burden of proving by a preponderance of the evi-

16. While such evidence is clearly insufficient to establish a *prima facie* case of a pattern and practice of discrimination, that is not to say that such evidence is not relevant to the Court's factual inquiry as to defendant's discriminatory intent under a disparate treatment theory. Quite the contrary, this and other evidence may be very relevant. In this regard, the Court notes that such evidence may serve to bolster an inference of discrimination and pretextuality. *See Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1976); *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825; *Grano v. Dept. of Development,* 637 F.2d at 1078–80.

dence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden [of production only] shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejections." [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973)]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). *See also Miller v. WFLI Radio, Inc.*, 29 F.E.P. Cases 929 (6th Cir., Aug. 17, 1982).

■ It is no longer subject to dispute that the three-pronged test enunciated in *McDonnell Douglas*, and reaffirmed in *Burdine*, applies to discharge cases, like that presently before the Court, as well as failure to hire cases. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). And where, as in this case, a plaintiff alleges that his or her discharge constitutes discrimination on the basis of sex, it is axiomatic that plaintiff not only bears the initial burden of establishing a *prima facie* case but also bears the ultimate burden of establishing intentional discrimination on the basis of sex.

In defining a *prima facie* case, the court in *McDonnell Douglas* explained the most common method whereby a plaintiff could meet his or her initial burden.

The complainant in a Title VII trial must carry the initial burden under the statute of a prima facie case of ... discrimination. This may be done by showing (i) that [he or she] belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas, supra*, 411 U.S. at 801 n. 11, 93 S.Ct. at 1823 n. 11.

■ While the four criteria set out in *McDonnell Douglas* provide guidance to a court attempting to determine whether a plaintiff has met his initial burden, establishing these four criteria is not the exclusive method for making out a *prima facie* case. Clearly, the test for whether a plaintiff has met his or her initial burden varies depending on the facts and circumstances of each case. The general rule in discrimination cases is that a *prima facie* case can be established by showing "that [plaintiff] is a member of a class entitled to protection of Title VII, and that he [or she] is accorded treatment different from that accorded persons otherwise similarly situated who are not members of the class." *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, 865 (6th Cir.1975); *Hall v. Ledex*, 669 F.2d 397 at 399 (6th Cir.1982); *Carter v. Petry, supra*, at 3.

■ Based on the above statement of the law, there can be little doubt on the facts of this case that the plaintiffs have met their initial burden of showing disparate treatment. Even the defendant concedes that plaintiffs have met their threshold burden of establishing a *prima facie* case. The evidence in this case shows that the plaintiffs were all members of a protected class, women, and that they were terminated following an illegal work stoppage while similarly situated men were not disciplined in any way.

More specifically, evidence was produced at trial which showed that plaintiffs carried picket signs during a wildcat strike at Westinghouse's Byesville plant on September 10, 1969. Plaintiffs produced further evidence at trial which showed that approximately 300 other employees, including male employees, participated in the illegal work stoppage. In addition, evidence was produced at trial to show that male employees' participation in the strike was comparable to the participation of plaintiffs.

Wayne Red, Ron Haga and Ed Benner picketed and transported picketers to picket locations during the course of this illegal work stoppage. The evidence further shows that male employees were named as defendants in a suit by defendant to enjoin the strike and that male employees picketed throughout the evening during the work stoppage. More specifically, the petition for injunctive relief filed in state court naming 44 employees, including 14 men, as defendants stated that those employees named were "actively engaged in organizing, promoting, conducting and maintaining a picket line" at the Byesville plant. *See* Jt. Exhibit I.

Finally, there was evidence to the effect that one male employee, who was observed by management, attempted to physically block cars from entering the plant and in the course of doing so committed acts of vandalism. The evidence, as described, leaves no doubt that male employees engaged in activities comparable, if not of a greater seriousness, to the activities of the plaintiffs. No male employees were disciplined, however. The Court therefore believes the plaintiffs have surmounted the initial hurdle in proving sex discrimination.

■ Once a *prima facie* case has been established, a presumption of intentional discrimination arises. *See Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Furnco Construction Corp.*, 438 U.S. at 577, 98 S.Ct. at 2949. It is then incumbent upon the defendant to introduce evidence showing that there was a legitimate, nondiscriminatory reason for the disparity in treatment. *Burdine, supra*, at 253, 101 S.Ct. at 1093. At first blush, the burden placed upon the defendant appears more onerous than it actually is. The case law makes clear that

[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff .... If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity ....

450 U.S. at 255, 101 S.Ct. at 1094. *See also, Grano*, 637 F.2d at 1079–81.

Assuming the defendants can meet their burden of production, the Court must then proceed to a third level of inquiry whereby the plaintiff must show that the legitimate reason articulated by the defendant is merely a pretext for what is in actuality illegal discrimination. As the Supreme Court noted in *Burdine:*

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *See McDonnell Douglas*, 411 U.S. at 804–805, 93 S.Ct. at 1825–1826.

450 U.S. at 256, 101 S.Ct. at 1095; *see also Hall, supra*, at 399; *Carter, supra*, at 2.

■ In making a determination of whether an employer is guilty of illegal sex discrimination, the third prong of the *Burdine-McDonnell Douglas* analysis requires a court to engage in a detailed factual inquiry in an attempt to determine whether an employer was in fact motivated by discriminatory intent, *i.e.*, whether the employer's proffered explanation is a pretext for what is in fact invidious discrimination. Evidence that may be relevant to showing pretext includes: (a) Treatment of plaintiff during course of prior employment; (b) reaction to any of plaintiffs' civil rights activities; and (c) employer's general policy or practice with regard to minorities. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

In the present case, the defendant, Westinghouse, recognizing its obligation to come forward with evidence to rebut plaintiffs' *prima facie* case, produced evidence that plaintiffs were discharged for their involvement in an illegal work stoppage. Specifically, defendant Westinghouse argues that since employees participating in an illegal work stoppage may be disciplined, *Gould, Inc. v. NLRB*, 612 F.2d 728, 732 (3d Cir.1979), the plaintiffs in this case could be discharged for their involvement in the illegal work stoppage on September 10, 1969, and their violation of the company rules forbidding willful hampering of production. Based on the foregoing, Westinghouse has arguably met its not so onerous burden of articulating a legitimate, non-discriminatory reason for the discharge of these women.

Our inquiry does not end there, however. The fact that the employer articulates a legitimate, non-discriminatory reason for discharge, thus satisfying its burden of production, merely means that the presumption of discrimination which arose when plaintiff made out a *prima facie* case is rebutted. It is now incumbent upon the plaintiff and the Court to proceed to the third prong of the *McDonnell Douglas* test. It is at this third level of inquiry that this case must be decided. Based on all the evidence adduced at trial, and as set forth more fully below, this Court concludes that plaintiffs have met their ultimate burden of proving intentional discrimination.

There are a number of facts, proven by the evidence in this case, which lead the Court to conclude that "a discriminatory reason more likely motivated [this] employer" and that "the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. First, with regard to all the facts and circumstances surrounding the discharge of the plaintiffs, the evidence shows that the employer, at the time it decided to discharge these women, possessed little information to support its conclusion that these women instigated this strike. While it is true that plaintiffs all held picket signs early on the first morning of the strike, it is also true that numerous other employees picketed on September 10, 1969. Aside from the somewhat dubious statements of supervisors and the union president concerning plaintiffs' activities during this strike, which statements this Court concludes lack trustworthiness and credibility, the employer had no reason to conclude that these women were more responsible than other male and female employees for the illegal work stoppage. Moreover, management possessed information, at the time it decided to discharge these women, that the plaintiffs, along with other employees, had been duped by union officials into believing that the union supported this strike.

In addition, plaintiffs produced substantial and credible evidence at trial to the effect that the employer not only failed to investigate, but also completely ignored the involvement of male employees and union officials in instigating this strike. For example, none of the male employees named in the suit to enjoin the strike, or known to management to have participated wholeheartedly in the strike, were discharged.[17] In fact, one of those male employees, Ron Haga, was later promoted to a salaried position despite defendant's complete awareness of Haga's activities during the strike. In addition, the fact that, at the time the defendant discharged these women, it was fully aware of the union's involvement and encouragement of this strike, and yet ignored the union's involvement and took no action against the union is probative of the employer's true motivation in discharging these women.

The facts recited above are not the sole basis for the Court's conclusion that the

---

**17.** For example, both Wayne Red and Ron Haga specifically confronted representatives of defendant on the first morning of the strike and explained their dissatisfaction with conditions in the plant and the reasons for their involvement in the strike. Furthermore, management officials specifically observed a male employee, Mr. Bill Swank, engaging in criminal and violent activity during the strike, clearly activity of greater seriousness than any activity engaged in by plaintiffs, and yet no disciplinary action was taken against Mr. Swank.

employer's proffered reason for the disparate treatment accorded these women is unworthy of credence and pretextual. There is further factual evidence in this case which leads the Court to believe that the employer was not simply punishing those it believed to be most responsible for the September 10 strike.

■■■ The plaintiffs have introduced evidence which persuades the Court that the defendant, in discharging the plaintiffs, was intentionally discriminating against a protected class of persons in violation of Title VII. Specifically, additional evidence of pretext includes evidence produced by plaintiffs concerning the treatment of plaintiffs during the entire period of employment with the defendant as well as evidence concerning this employer's general policies or practices with regard to women.[18]

First, with regard to the treatment of these plaintiffs during the entire period of their employment, at least two of the plaintiffs, prior to their discharges, had "run-ins" with management when these plaintiffs made complaints about conditions in the plant, including complaints about the treatment of women. Following these confrontations, both plaintiffs Vance and Campbell were moved temporarily from their jobs to other jobs in the plant which required them to work closer to machinery, which was a major source of complaints about dust and dirt. Later, during the strike, these prior "run-ins" may have in part been the source of management's accusations that the strike was the result of the activity of a few "female dissidents," and that the strike began when "several female employees ... decided to take matters into their own hands."

While the Court concludes that the evidence concerning the past treatment of some or all of these plaintiffs is relevant to the question of pretextuality, such evidence does not rise to the level of that which is required in making out a case of retaliation under § 704(a) of Title VII. In proving retaliation under Title VII, a plaintiff must show

[F]irst, protected participation or opposition under Title VII known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activities; and third, a causal connection between the first two elements, that is a retaliatory motive playing a part in the adverse employment actions ...

*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). In this case, while there is evidence that plaintiffs all complained about conditions in the plant, there is not sufficient evidence from which the Court could conclude that plaintiffs' discharges were causally connected to their "[opposition to] any practice made an unlawful employment practice by this title." Section 704(a).

While there is some evidence that plaintiff Vance specifically complained of allegedly discriminatory overtime and promotion practices, that evidence does not persuade the Court that it is more likely than not that plaintiff Vance was discharged for those complaints.

In addition to the evidence concerning past treatment of individual plaintiffs, there is evidence of defendant's general policies and practices with respect to women which is probative on the issue of the true reasons for plaintiffs' discharges. The disparity between the treatment of men and women during the course of this

---

**18.** It is clear that this type of evidence is relevant to a determination of whether the·stated basis for disparate treatment is pretextual. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.

As this Court has already noted, the evidence in this case concerning defendant Westinghouse's policies and practices with regard to women falls short of what is required in cases alleging a "pattern or practice" of discrimination. *See Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1976); *see* note 17, *supra.* This evidence is not without probative value, however. Specifically, the Court finds such evidence relevant and persuasive with respect to the issue of intentional discrimination and pretextuality.

illegal work stoppage would seem to be a mere extension of the disparity in the way this employer generally treated men and women.

Specifically, the evidence in this case is that Westinghouse employed 370 female hourly employees and 147 male hourly employees. As of the date of plaintiffs' discharges, however, no women were employed as buffers, material handlers, set-up employees or supervisors. No women employed by defendant held jobs with classifications higher than grade 4. The Court not only has serious doubts about defendant's contention that no women ever bid for any of the jobs in these higher classifications, but the Court also believes that the complete absence of women from these higher job classifications, in a plant where the majority of employees are women, is a fact which bolsters plaintiffs' evidence of intentional discrimination and pretextuality. Furthermore, the Court notes that the selection process for supervisors at least was controlled entirely by the plant and personnel managers. No bidding procedures were employed in selecting supervisors and no woman, by defendant's own admission, was ever selected or even considered for a supervisory position at the Byesville plant.

Finally, with regard to defendant's general policies and practices with respect to women, there is evidence that on at least a few occasions, a male employee in a higher job classification performed overtime work that should have been assigned to a female employee in a lower job classification. When a female employee objected to this assignment of overtime to a male employee, she was informed by Mr. Gaydosik, the union president, and Mr. Walters, a supervisor on the iron assembly line, that male employees were assigned overtime because they needed the money more than women.

While the Court cannot conclude that the evidence concerning assignment of over-time is such to support a finding that the defendant had a "pattern or practice" of giving male employees more favorable consideration than female employees in the assignment of overtime, the Court does believe that there is sufficient evidence to support a finding that on a few occasions a male employee was doing overtime work which should have been assigned to a female employee.

Based upon the evidence adduced at trial by plaintiffs concerning defendant's general practices with regard to women and defendant's treatment of these women in their prior employment; and based upon this Court's careful inquiry into all the facts and circumstances surrounding the discharges of these women, the Court feels compelled to conclude that discriminatory intent motivated this employer and that the defendant's proffered explanation for disparate treatment is mere pretext.

 Having concluded that the plaintiffs have proved illegal sex discrimination, the Court must now determine the amount of damages to be awarded the plaintiffs. Section 706 of Title VII allows a court to make victims of illegal discrimination whole by awarding those victims back pay reduced by the amount of any "interim earnings or amounts earnable with reasonable diligence." Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g). This Court has already concluded that but for the period when plaintiff Hunter adopted her child and the period following plaintiff Campbell's marriage, all the plaintiffs exercised due diligence in seeking employment and are thus entitled to awards of back pay reduced by their earnings since their discharges.[19]

First, in calculating back pay for these plaintiffs the Court notes that the pay rates in effect at Westinghouse/Scovill from September 1969 until January 1982 are readily ascertainable from the con-

---

**19.** The Court has no basis for calculating what fringe benefits plaintiffs would have been entitled to had they remained employed at Westinghouse until the plant's closing. Since the burden is on the plaintiffs to prove damages, the lack of evidence concerning the fringe benefits plaintiffs would have received had they remained employed at Westinghouse amounts to a failure of proof precluding the award of any such damages.

tracts and pay cards admitted into evidence as Exhibits 9, 12, 13, 17–19.[20] The defendant does not dispute the figures arrived at by plaintiffs to reflect the pay rates in effect during the period of time in question. Nor does defendant dispute the amount actually earned by each of the plaintiffs during the period in question. Calculating the amount of back pay each of these plaintiffs is entitled to is therefore made possible by simply subtracting plaintiffs' actual earnings from the amount the plaintiffs would have earned at Westinghouse had they not been discharged in 1969.[21]

Plaintiffs argue that in calculating a back pay award the Court should assume that after a certain period of time plaintiffs all would have been promoted to a higher grade or job classification. In support of their position, plaintiffs introduced evidence that other employees, who worked with plaintiffs at the time of their discharges, were in fact promoted. *See* pay cards and contracts admitted into evidence as Exhibits 9, 12, 13, 17–19.

▮ Based on the terms of the collective bargaining agreement, the Court cannot conclude with any degree of certainty that plaintiffs would have met the criteria for receiving promotions to higher labor grades. While it is true that length of service was one factor considered in promoting an employee to a higher grade, other criteria were also considered in making promotion decisions.[22] There is not sufficient evidence in this case that plaintiffs would have met all criteria for receiving promotions to higher grades. In calculating the amounts plaintiffs would have earned had they remained employed at Westinghouse, therefore, the Court will not indulge in the unsupported assumption that these plaintiffs would have been promoted to higher labor grades.

At this point, in an effort to clarify how the Court has calculated the damage awards in this case, the Court believes that it would be helpful, using plaintiff Vance as an example, to show how the Court has arrived at the back pay to which this plaintiff is entitled for the year 1969. In this regard, in that year, plaintiff Vance would have earned $1,206.57 at Westinghouse if she had not been discharged. Plaintiff Vance actually earned $594.56 in 1969 following her discharge. Therefore, plaintiff Vance is entitled to back pay in the amount of $612.01 for the year 1969.

Having explained the method being used by the Court to calculate plaintiffs' back pay awards, the Court will dispense with detailed written explanations of the year-to-year calculations used in arriving at damage awards for plaintiffs. Rather, the Court has attached hereto as Appendix B a

**20.** The Court has attached hereto as Appendix A a chart detailing the pay rates in effect at Westinghouse from September 1969 to January 1982 for grade 1 and 2 employees.

**21.** In addition, plaintiffs have requested an award of prejudgment interest. The question of whether a Title VII plaintiff is entitled to prejudgment interest on a back pay award is one which a number of courts have confronted. *See, e.g., Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3d Cir.1976); *EEOC v. Pacific Press Pub. Assn.,* 482 F.Supp. 1291, 1319 (D.Cal.1979), *aff'd,* 676 F.2d 1272 (9th Cir.1982); *United States v. Lee Way Motor Freight, Inc.,* 15 F.E.P. Cases 1385, 1388 (W.D.Okl.1977); *Davis v. Jobs for Progress, Inc.,* 427 F.Supp. 479 (D.Ariz.1976); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir.1974). The majority of courts, which have considered this question, seem to agree that the award of such interest serves Title VII's dual purpose of making the victims of discrimination whole and deterring discrimina-

tion. The Court finds the weight of existing authority favoring the application of interest to Title VII awards too great to be ignored. *See* B. Schlei & P. Grossman, *Employment Discrimination Law* (1976) at 1258 and 1979 Supplement at 338 and numerous cases cited therein. The Court therefore concludes that plaintiffs are entitled to prejudgment interest at the rate of 8%, compounded annually. This interest is included in the Court's calculations of plaintiffs' damage awards. *See* Appendix B attached hereto.

**22.** Articles XIII and XIV of the collective bargaining agreement set forth the job classification system used by Westinghouse as well as the criteria used for upgrading employees. A careful reading of the terms of that contract discloses that criteria other than seniority would be used in making a decision on whether to upgrade an employee. The Court cannot assume, absent some evidence in the record, that all the plaintiffs would have met the criteria necessary for being promoted to a higher labor grade.

copy of charts which detail the calculations made by the Court in determining the yearly back pay entitlements for each of these plaintiffs. Pursuant to the calculations set forth in Appendix B, it is the decision of the Court that plaintiff Vance be and is hereby awarded damages in the amount of $86,421.63; that plaintiff Campbell be and is hereby awarded damages in the amount of $26,092.58; that plaintiff Hunter be and is hereby awarded damages in the amount of $65,389.69.

The Clerk is hereby directed to enter judgment for plaintiffs in the amounts indicated above.

Finally, the Court notes that as of November 18, 1982, the date on which counsel for the local union withdrew, the local union has failed to appear or otherwise defend in this action. However, plaintiffs have not at any time moved for entry of a default judgment against the local union. If plaintiffs wish to have a default judgment entered against the union, they should file a motion within ten (10) days of the date of this order to that effect pursuant to Rule 55 of the Federal Rules of Civil Procedure.

## APPENDIX A

### PAY RATES IN EFFECT AT WESTINGHOUSE/SCOVILL
from 9/69 TO 1/82 FOR GRADES 1, 2 and 3 *

| PAY RATE PERIOD | | HOURLY | GRADE 1 WEEKLY (37.5 hrs) | TOTAL | HOURLY | GRADE 2 WEEKLY (37.5 hrs) | TOTAL |
|---|---|---|---|---|---|---|---|
| 9/15/69–12/31/69 | 15 weeks | 2.145 | 80.438 | 1206.570 | 2.200 | 82.500 | 1237.500 |
| 1/5/70–11/9/70 | 45 weeks | 2.375 | 89.060 | 4007.810 | 2.430 | 91.125 | 4100.625 |
| 11/9/70–12/31/70 | 7 weeks | 2.425 | 90.938 | 636.566 | 2.480 | 93.000 | 651.000 |
| 1/71–3/15/71 | 11 weeks | 2.425 | 90.938 | 1000.318 | 2.480 | 93.000 | 1023.000 |
| 3/15/71–11/14/71 | 35 weeks | 2.575 | 96.563 | 3379.705 | 2.630 | 98.625 | 3451.875 |
| 11/14/71–12/31/71 | 6 weeks | 2.655 | 99.563 | 597.378 | 2.710 | 101.625 | 609.750 |
| 1/72–12/31/72 | 52 weeks | 2.655 | 99.563 | 5177.276 | 2.710 | 101.625 | 5284.500 |
| 1/73–12/73 | 52 weeks | 2.655 | 99.563 | 5177.276 | 2.710 | 101.625 | 5284.500 |
| 1/74–12/74 | 52 weeks | 2.655 | 99.563 | 5177.276 | 2.710 | 101.625 | 5284.500 |
| 1/75–6/8/75 | 23 weeks | 2.655 | 99.563 | 2289.949 | 2.710 | 101.625 | 2337.375 |
| 6/8/75–12/8/75 | 26 weeks | 2.905 | 108.938 | 2832.375 | 2.960 | 111.000 | 2886.000 |
| 12/8/75–12/31/75 | 3 weeks | 3.005 | 112.688 | 338.064 | 3.060 | 114.750 | 344.250 |
| 1/76–12/76 | 52 weeks | 3.005 | 112.688 | 5859.776 | 3.060 | 114.750 | 5967.000 |
| 1/77–6/6/77 | 23 weeks | 3.005 | 112.688 | 2591.824 | 3.060 | 114.750 | 2639.250 |
| 6/6/77–9/5/77 | 13 weeks | 3.175 | 119.063 | 1547.819 | 3.230 | 121.125 | 1574.625 |
| 9/5/77–12/5/77 | 13 weeks | 3.245 | 121.688 | 1581.944 | 3.300 | 123.750 | 1608.750 |
| 12/5/77–12/31/77 | 3 weeks | 3.295 | 123.563 | 365.064 | 3.350 | 125.625 | 376.875 |
| 1/78–6/5/78 | 23 weeks | 3.295 | 123.563 | 2841.949 | 3.350 | 125.625 | 2889.375 |
| 6/5/78–9/4/78 | 13 weeks | 3.455 | 129.563 | 1684.319 | 3.510 | 131.625 | 1171.125 |
| 9/4/78–12/31/78 | 16 weeks | 3.575 | 134.063 | 2145.008 | 3.630 | 136.125 | 2178.000 |
| 1/79–6/9/79 | 23 weeks | 3.575 | 134.063 | 3083.449 | 3.630 | 136.125 | 3130.875 |
| 6/9/79–12/79 | 29 weeks | 4.275 | 160.313 | 4649.007 | 4.330 | 162.375 | 4708.875 |
| 1/80–6/8/80 | 23 weeks | 4.275 | 160.313 | 3687.199 | 4.330 | 162.375 | 3734.625 |
| 6/9/80–9/1/80 | 12 weeks | 4.485 | 168.188 | 2018.256 | 4.540 | 170.250 | 2043.000 |
| 9/1/80–12/31/80 | 17 weeks | 4.760 | 178.500 | 3034.500 | 4.815 | 180.563 | 3069.571 |
| 1/81–6/8/81 | 23 weeks | 4.760 | 178.500 | 4105.500 | 4.815 | 180.563 | 4152.949 |
| 6/8/81–9/1/81 | 12 weeks | 4.950 | 185.625 | 2227.500 | 5.005 | 187.688 | 2252.256 |
| 9/1/81–12/31/81 | 17 weeks | 5.070 | 190.125 | 3232.125 | 5.125 | 192.188 | 3267.196 |
| 1/1/82–1/15/82 | 11 days | 5.070 | 190.125 | 418.275 | 5.125 | 192.188 | 422.813 |

* Pay rate changes reflect contracts with new terms and contract mandated pay raises (including cost of living) based on analysis of the contracts and pay cards admitted into evidence as Exhibits 9, 12, 13, 17, 18, 19.

## APPENDIX B

### Plaintiff Vance

| Year | Would have earned at Westinghouse/ Scovill | Actual Earnings | | Yearly Difference | Yearly difference + previous back pay + interest | 8% Interest | Cumulative Back pay & interest |
|------|------|------|------|------|------|------|------|
| 1969 | $1,206.57 | $ 434.56<br>160.00<br>594.56 | (Plastic Fabricators)<br>(Unemployment)<br>Total | $ 612.01 | | $ 12.24 | $ 624.25 |
| 1970 | 4,664.38 | 640.00<br>350.00<br>990.00 | (Unemployment)<br>(Chal's)<br>Total | 3,654.38 | $ 4,278.63 | 342.29 | 4,620.92 |
| 1971 | 4,977.41 | 1,391.18 | (Chal's) | 3,586.23 | 8,207.15 | 656.57 | 8,863.72 |
| 1972 | 5,177.28 | –0– | | 5,177.28 | 14,041.00 | 1,123.28 | 15,164.28 |
| 1973 | 5,177.28 | 99.63<br>860.75<br>960.38 | (Plastic Fabricators)<br>(Chal's)<br>Total | 4,216.90 | 19,381.18 | 1,550.49 | 20,931.67 |
| 1974 | 5,177.28 | 867.00 | (Chal's) | 4,310.28 | 25,241.95 | 2,019.36 | 27,261.31 |
| 1975 | 5,460.39 | 480.00 | (Chal's) | 4,980.39 | 32,241.70 | 2,579.34 | 34,821.04 |
| 1976 | 5,859.78 | 1,345.05<br>332.40<br>300.00<br>1,977.45 | (Chal's)<br>(LK)<br>(1 Hr. Cleaners)<br>Total | 3,882.33 | 38,703.37 | 3,096.27 | 41,799.64 |
| 1977 | 6,086.64 | 364.00<br>400.00<br>1,856.40<br>2,620.40 | (Pancake House)<br>(Wallpaper hanging)<br>(Maremont)<br>Total | 3,466.24 | 45,265.88 | 3,621.27 | 48,887.15 |
| 1978 | 6,671.27 | 8,387.99 | (Maremont) | –1,716.72<br>(Earnings exceed amt. would have earned) | 48,887.15 | 3,910.97 | 52,798.12 |
| 1979 | 7,732.45 | 9,397.56 | (Maremont) | –1,665.11<br>(Earnings exceed amt. would have earned) | 52,798.12 | 4,223.85 | 57,021.97 |
| 1980 | 8,739.96 | 1,358.84<br>2,500.00<br>3,858.84 | (Grisham)<br>(Unemployment)<br>Total | 4,881.12 | 61,903.09 | 4,952.25 | 66,855.34 |
| 1981 | 9,565.13 | 3,212.27 | (Dow Corning) | 6,352.86 | 73,208.20 | 5,856.66 | 79,064.86 |
| 1982 | 418.28 | 352.00 | (Dow Corning) | 66.28 | 79,131.14 | 6,330.49 | 85,461.63 |

$85,461.63 Subtotal
\* 960.00 Severance Pay
$86,421.63 Total

\* Severance pay for each plaintiff was calculated by reference to plaintiffs' Exhibits 21 and 22.

Plaintiff Hunter

| Year | Would have earned at Westinghouse/ Scovill | Actual Earnings | | Yearly Difference | Yearly difference + previous back pay + interest | 8% Interest | Cumulative Back pay & interest |
|---|---|---|---|---|---|---|---|
| 1969 | $1,206.57 | –0– | | $1,206.57 | | $ 24.13 | $ 1,230.70 |
| 1970 | 4,664.38 | –0– | | 4,664.38 | $ 5,895.08 | 471.61 | 6,366.69 |
| 1971 (exclude 8/71–1/72 child adoption) | 2,448.77 | –0– | | 2,448.77 | 8,815.46 | 705.24 | 9,520.70 |
| 1972 | 5,177.28 | –0– | | 5,177.28 | 14,697.98 | 1,175.84 | 15,873.82 |
| 1973 | 5,177.28 | 350.33 | (Star Plastics) | 4,826.95 | 20,700.77 | 1,656.06 | 22,356.83 |
| 1974 | 5,177.28 | –0– | | 5,177.28 | 27,534.11 | 2,202.73 | 29,736.84 |
| | | 95.00 | (A & J Cleaners) | | | | |
| | | 1,632.47 | (Ohio Inns) | | | | |
| 1975 | 5,460.39 | 2,727.79 Total | | 2,732.60 | 32,469.44 | 2,597.56 | 35,067.00 |
| 1976 | 5,859.78 | 3,332.68 | (Ohio Inns) | 2,527.10 | 37,594.10 | 3,007.53 | 40,601.63 |
| 1977 | Cut off back pay differential 1/77 due to better paying | | | | 40,601.63 | 3,248.13 | 43,849.76 |
| 1978 | job. Continue interest on accrued balance. | | | | 43,849.76 | 3,507.98 | 47,357.74 |
| 1979 | | | | | 47,357.74 | 3,788.61 | 51,146.36 |
| 1980 | | | | | 51,146.36 | 4,091.71 | 55,238.07 |
| 1981 | | | | | 55,238.07 | 4,419.05 | 59,657.12 |
| 1982 | | | | | 59,657.12 | 4,772.57 | 64,429.69 |

$64,429.69 Subtotal
* 960.00 Severance Pay
$65,389.69 Total

* Severance pay for each plaintiff was calculated by reference to plaintiffs' Exhibits 21 and 22.

Plaintiff Campbell

| Year | Would have earned at Westinghouse/ Scovill | Actual Earnings | Yearly Difference | Yearly difference + previous back pay + interest | 8% Interest | Cumulative Back pay & interest |
|------|------|------|------|------|------|------|
| 1969 | $1,237.50 | –0– | $1,237.50 | | $ 24.75 | $ 1,262.25 |
| 1970 | 4,751.63 | –0– | 4,751.63 | $ 6,013.88 | 481.11 | 6,494.99 |
| 1971 | 5,084.63 | 522.00 (Elby's) 1,232.00 (Carousel Club) 1,754.00 Total | 3,330.63 | 9,825.62 | 786.05 | 10,611.67 |
| 1972 | 5,284.50 | 7,020.00 (Carousel Club) | –1,735.50 | 10,611.67 | 848.93 | 11,460.60 |
| | | | (Earnings exceed amt. would have earned) | | | |
| 1973 | Cut off back-pay differential following plaintiff's marriage. | | | | | |
| | Continued interest on accrued balance. | | | 11,460.60 | 916.85 | 12,377.45 |
| 1974 | | | | 12,377.45 | 990.20 | 13,367.65 |
| 1975 | | | | 13,367.65 | 1,069.41 | 14,437.06 |
| 1976 | | | | 14,437.06 | 1,154.96 | 15,592.03 |
| 1977 | | | | 15,592.03 | 1,247.36 | 16,839.39 |
| 1978 | | | | 16,839.39 | 1,347.15 | 18,186.54 |
| 1979 | | | | 18,186.54 | 1,454.92 | 19,641.46 |
| 1980 | | | | 19,641.46 | 1,571.32 | 21,212.78 |
| 1981 | | | | 21,212.78 | 1,697.02 | 22,909.80 |
| 1982 | | | | 22,909.80 | 1,832.78 | 24,742.58 |

$24,742.58 Subtotal
* 1,350.00 Severance Pay
$26,092.58 Total

* Severance pay for each plaintiff was calculated by reference to plaintiffs' Exhibits 21 and 22.