**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al., Plaintiffs,**

v.

**NUTRI/SYSTEM, INC., Defendant.**

Civ. A. No. 87–0798–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 28, 1988.

Memorandum Opinion May 5, 1988.

Paula Newett, Asst. U.S. Atty., Alexandria, Va., for plaintiffs.

Wm. D. Patkus, Fairfax, Va., for Intervenor Bunton.

Douglas E. McKinley, Alexandria, Va., for defendant.

### JUDGMENT ORDER

ELLIS, District Judge.

This matter came before the Court for trial on plaintiff Equal Employment Opportunity Commission's (EEOC) and intervenor-plaintiff Wilett Bunton's (intervenor) claim of racial discrimination in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. At the conclusion of the trial, the Court, from the bench, issued findings of fact and conclusions of law with respect to liability. In essence, the Court found that defendant's discharge of intervenor was racially motivated, in violation of Title VII. The parties were then given an opportunity to submit additional memoranda and supporting materials concerning remedies and attorney's fees and costs. 42 U.S.C. § 2000e–5(k). The Court has considered these materials and sets forth its conclusions below. A Memorandum Opinion on

the liability and remedy aspects of this case may be issued at a later date.

## I. *Reinstatement*

■ The EEOC seeks an offer of reinstatement on behalf of intervenor. Intervenor, however, has made unmistakably clear that she has no interest in reemployment with Nutri/System. During her deposition on December 7, 1987, intervenor stated that she was not seeking reinstatement. (*See* Deposition of Wilett Willis Bunton, at 107 (attached as Exhibit 3 to defendant's Post Trial Memorandum Concerning Remedies)). No evidence was presented at trial to indicate that intervenor desires reemployment with Nutri/System. A reinstatement order under these circumstances is unwarranted and unnecessary. *See Bitsouni v. Sheraton Hartford Corp.*, 33 Fair Empl.Prac.Cas. (BNA) 894 (D.Conn.1983) (court may deny reinstatement where there is no evidence that plaintiff seeks former position). Accordingly, the Court, in the exercise of its discretion, declines to issue a reinstatement order in this case.

## II. *Backpay*

Where, as here, there is a finding of liability under Title VII, the plaintiff's remedy ordinarily includes an award of backpay. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421–22, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). In determining the amount of backpay due, the Court starts with the familiar principles that (i) an award of backpay is usually appropriate where unlawful discrimination is found, (ii) that district courts have discretion in fixing the amount of the award, (iii) that one of the primary purposes of backpay relief is to make the victim of discrimination whole and (iv) that district courts should avoid making speculative awards. *Albemarle Paper Co.*, 422 U.S. at 421–22, 95 S.Ct. at 2373–2374; *Leonard v. City of Frankfort Elec. & Water Plant Bd.*, 752 F.2d 189, 195 (6th Cir.1985); *Pollard v. Grinstead*, 741 F.2d 73, 75 (4th Cir.1984); *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1185 (6th Cir.1983). Given the Court's finding of liability and the evidence on lost income, intervenor is entitled to backpay from the defendant in the amount of $51,696.72, with post-judgment interest running from March 28, 1988, at the rate of 6.71 percent, until the judgment is paid. The backpay amount includes pre-judgment interest at the rate of eight percent per annum, compounded quarterly.

Defendant has not carried its burden of demonstrating that intervenor failed to take reasonable steps to mitigate her damages. *Edwards v. School Bd. of the City of Norton*, 658 F.2d 951, 956 (4th Cir.1981). Therefore, backpay is awarded for the period from March 5, 1982, the date of her termination, to December 31, 1985. The record reflects that after December 31, 1985, intervenor's income, had she remained a Nutri/System center manager, would have been less than the amount she actually earned from other sources.

■ In calculating the amount of monthly commission income to be added to intervenor's basic salary to yield the amount of backpay due, the Court chose to average five figures representing two percent of gross sales for the Springfield center for the months of December, 1981 ($492.54), January, 1982 ($427.88), February, 1982 ($737.16), March, 1982 ($1559.10) and April, 1982 ($2094.10). The average of these figures equals $1062.16. This amount was then multiplied by three to obtain the quarterly commission figure ($3186.47) and added to the amount of salary intervenor would have earned per quarter ($2500). The resulting sum ($5686.47) was the basis for calculating the amount of backpay due per quarter. Intervenor's actual earnings from other sources per quarter were subtracted from $5686.47. The result was the amount of net backpay due for that quarter. Interest at the rate of eight percent was then applied to these net quarterly figures and compounded quarterly.

Considerations of fairness move the Court, in its discretion, to adopt this means of fixing an appropriate backpay award. Limiting intervenor to her historical 1981 commission income would unfairly deny her the benefit of the advertising campaign

defendant instituted early in 1982. On the other hand, giving intervenor credit for commissions earned by her successor from May, 1982 through 1984 would be speculative and give intervenor an undeserved and unwarranted windfall. *Cf. Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1185 (6th Cir.1983) (plaintiff's testimony that he could have earned two to three times his former income in sales territory which was expanded after his discharge was too speculative to support a damage award); *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1031–32 (6th Cir.1977) (award upheld where district court based backpay on average of compensation during weeks when plaintiffs' earnings were highest, rather than on earnings of white sales agents). Intervenor is not entitled to receive the benefits of her successor's abilities and efforts as part of the backpay award. Therefore, the Court chose to average commissions for December, January and February, the last three full months intervenor worked, as well as March and April, the months following intervenor's discharge. The fairness of selecting this period is manifest: it encompasses the period immediately prior to intervenor's discharge, the period when her earnings were highest, and it includes the two months following her discharge in order to give her the benefit of the advertising campaign commenced while she was still employed.

The Court denies intervenor's request for compensation for accrued sick and personal leave, paid vacation, paid holidays, bonuses, prizes, health and life insurance premiums, and job hunting expenses. Intervenor's evidence on these fringe benefits and expenses was meager and unpersuasive. *Hunter v. Westinghouse Elec. Corp.*, 576 F.Supp. 704, 727 (S.D.Ohio 1983) (lack of evidence amounted to a failure of proof precluding a monetary award for fringe benefits). Therefore, she did not meet her burden of proving that she was denied these benefits or suffered these losses.

### III. *Injunctive Relief*

The injunctive relief requested by the EEOC is granted in part. Defendant is enjoined from engaging in racially discriminatory termination practices with respect to its employees. The injunction does not extend to other employment practices or forms of unlawful discrimination which are not before the Court. *See Davis v. Richmond, Fredericksburg & Potomac R.R. Co.*, 803 F.2d 1322, 1328 (4th Cir.1986) (injunction should be tailored to violation charged). Defendant is also ordered to expunge from its records and files all documents produced after January 1, 1982 regarding substandard job performance on the part of Wilett W. Bunton.

### IV. *Notice*

The EEOC's request for the posting of notice is granted. The notice is attached as an appendix to this Order and shall be conspicuously posted at defendant's Springfield, Virginia center for two months. In accordance with this Order, the notice makes no reference to reinstatement.

### V. *Attorney's Fees and Costs*

A hearing on intervenor's counsel's request for fees and costs has been scheduled for 2:00 p.m. on April 1, 1988. A separate order will be issued on this aspect of the case.

### APPENDIX

### NOTICE TO EMPLOYEES

### POSTED PURSUANT TO AN ORDER

### OF THE UNITED STATES DISTRICT COURT FOR THE

### EASTERN DISTRICT OF VIRGINIA

#### Alexandria Division

In *EQUAL EMPLOYMENT OPPORTUNITY COMMISSION v.*

*NUTRI/SYSTEM, INC.*, C.A. No. 87–798–A

Under Section 703 of Title VII of the Civil Rights Act of 1964, as amended:

It shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

WE WILL NOT engage in any of the above acts or practices.

WE WILL NOT discriminate or retaliate in any manner against any person because of opposition to any practice declared unlawful under Title VII or because of the filing of a charge, the giving of testimony or assistance, or the participation in any investigation, proceeding, or hearing under Title VII.

WE WILL maintain and conduct all discharge policies and practices in a manner which does not discriminate on the basis of race.

WE WILL expunge from our records and files any documents produced after January 1, 1982 regarding substandard job performance on the part of Wilett W. Bunton.

WE WILL make Wilett W. Bunton whole for any lost wages that she suffered as a result of our alleged discrimination against her.

NUTRI/SYSTEM, INC.

By: _____
   (Representative and Title)

Dated: _____

---

**1.** The Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, was patterned after the analogous Title VII Act provision, 42 U.S.C. § 2000e–5(k), and in general, the same principles and standards for awarding fees are applicable to both provisions. *Hanrahan v. Hampton,* 446 U.S. 754, 758, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (*per curiam*); *see also Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct.

## MEMORANDUM OPINION

This Title VII, 42 U.S.C. §§ 2000e *et seq.,* action was tried to the Court on February 10, 1988. At the conclusion of the evidence and after argument of counsel, the Court issued its findings of fact and conclusions of law from the bench. In essence, the Court found that considerations of race had impermissibly infected the decision to discharge the plaintiff, in violation of Title VII. The Court took under advisement the remedy, costs and attorney's fees issues, giving the parties an opportunity to submit briefs and other appropriate material on these matters. The parties did so and thereafter, by Order dated March 28, 1988, the Court ruled on the remedy issues presented and awarded damages and specific injunctive relief. Because the submissions on attorney's fees and costs were insufficient, the Court scheduled a hearing on these matters and called for additional submissions. The hearing was held on April 1, 1988, and the parties' supplemental submissions have been received and reviewed. Accordingly, this Memorandum Opinion sets forth the Court's rulings on costs and attorney's fees in this case.

### Attorney's Fees

The rules governing fee awards in Title VII and civil rights cases [1] are reasonably well settled. There are four overarching principles. First, it is Congress' intent, made explicit in the statute, that a "prevailing party" should recover reasonable attorney's fees. 42 U.S.C. § 2000e–5(k). Second, the fee applicant bears the burden of establishing by clear and convincing evidence the amount of a reasonable fee in the circumstances. *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Spell v. McDaniel,* 824 F.2d 1380, 1402 (4th Cir. 1987), *cert denied,* —— U.S. ——, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988).[2] Third, it is

---

1933, 1939, n. 7, 76 L.Ed.2d 40 (1983); S.Rep. 94–1011, 94th Cong., 2nd Sess. 4 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5908, 5912.

**2.** Former Chief Justice Burger in *Hensley* put this point succinctly:

A district judge may not, in my view, authorize the payment of attorney's fees unless the

within the sound discretion of the trial judge to fix the amount of a reasonable fee. *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941; *Spell*, 824 F.2d at 1401. This discretion, based typically on a first-hand knowledge of the case and the pertinent factors that might affect a fee amount, will not be disturbed except in cases of manifest abuse.[3] To facilitate appellate review, however, it is incumbent on the district judge to articulate his or her reasons for the fee decision, though formal Rule 52, Fed.R.Civ.P., findings are not mandated. *Id.* at 278. The fourth overarching principle is no less important than the first three, though it is perhaps honored more often in the breach than in the observance. Simply put, it is, in the words of Justice Powell, that "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941. The conclusion of the case on the merits should essentially be the end of the litigation, not just a prelude to another full-scale battle. *See National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1324 (D.C.Cir.1982) (*per curiam*).

▪ Against the background of these general principles, courts have elucidated more specific guidance concerning the methodology for fixing a reasonable fee for a prevailing party. The starting point is to calculate the "lodestar figure," the product of the number of hours reasonably spent on appropriate legal tasks and an appropriate hourly rate. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–1940; *see also Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir. 1980). Proper documentation is the key to ascertaining the number of hours reasonably spent on legal tasks. Fee claimants must submit documentation that reflects reliable contemporaneous recordation of time spent on legal tasks that are described with reasonable particularity. *See Hensley*, 461 U.S. at 440–41, 103 S.Ct. at 1943 (Burger, C.J., concurring); *National Ass'n of Concerned Vets*, 675 F.2d at 1327. The information supplied must be sufficient to permit the trial judge to "weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities," *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974), so that "hours that were not 'reasonably expended'" can be excluded. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. Absent such documentation, a claimant's submission is no better than a *post hoc* estimate. Inadequate documentation is a basis for reducing or denying a fee award. *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939.[4]

Fee claimants must also furnish specific support for the hourly rate they propose. *Blum v. Stenson*, 465 U.S. 886, 895–96, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). Typically, a reasonable hourly rate is established by affidavits from lawyers with first-hand knowledge of the prevailing community rate in comparable cases for counsel with similar qualifications. *See Spell*, 824 F.2d 1380, 1402. Recent fee awards in similar cases and claimants' actual billing practices may also be probative. *Id.*

The lodestar figure, once calculated, is not the end of the process. Instead, it is at this point that it is appropriate for the Court to consider adjusting the lodestar figure upward or downward on the basis of one or more of the following factors:

---

attorney involved has established by clear and convincing evidence the time and effort claimed and shown that the time expended was necessary to achieve the results obtained. ... As a result, the party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed.
*Hensley*, 461 U.S. at 440–41, 103 S.Ct. at 1943.

3. *See Lea v. Cone Mills Corp.*, 467 F.2d 277, 279 (4th Cir.1972) (an award of $10,000 for 515 hours of work claimed by twelve lawyers was not beyond the district court's discretion in the circumstances); *see also EEOC v. Strasburger, Price, Kelton, Martin & Unis*, 626 F.2d 1272, 1274 (5th Cir.1980) (award of $2,500 in fees for 236.9 hours spent by intervenors' counsel upheld as within district court's discretion).

4. Indeed, the prevailing party's counsel should, prior to submitting a fee application, "make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary...." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–1940.

574

(1) the time and labor expended;

(2) the novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services rendered;

(4) the attorney's opportunity costs in pressing the instant litigation;

(5) the customary fee for like work;

(6) the attorney's expectations at the outset of the litigation;

(7) the time limitations imposed by the client or circumstances;

(8) the amount in controversy and the results obtained;

(9) the experience, reputation and ability of the attorney;

(10) the undesirability of the case within the legal community in which the suit arose;

(11) attorneys' fees awards in similar cases.[5]

Using all of these principles as its lens, the Court now focuses sharply on the fee claim made by counsel for the intervenor, the prevailing party in this case.

Counsel's fee application is set forth in his Request for Payment of Attorney's Fees, dated February 18, 1988. It consists of an unsworn four page pleading to which is attached the thirteen undated statements

for services rendered that were sent to the intervenor over a six year period from March, 1982 to February, 1988. The total fee claimed is $43,689.51. This amount is alleged to represent approximately 436.9 hours of legal work billed at the rate of $100 per hour.

■ This fee application fails to meet even minimal documentation standards; it does not include the detailed information necessary to enable the Court to make an informed decision as to its merits. To begin with, the attached statements do not contain adequate descriptions or breakdowns of the work performed. The statements are replete with numerous references to telephone conferences and meetings, but seldom offer any description of the nature or purpose of the call or meeting. This is not enough; it is "insufficient to provide the District Court with very broad summaries of work done and hours logged." *National Ass'n of Concerned Veterans,* 675 F.2d 1319, 1327. Quite apart from inadequate work descriptions and breakdowns, the services are not identified by date until 1988. This undermines confidence in their contemporaneity and hence in their reliability.[6] Set forth in the margin, by way of example, are a number of typical entries from various statements.[7]

5. These factors, initially spelled out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), were embraced by the Fourth Circuit in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n. 28, *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), and in *Spell v. McDaniel,* 824 F.2d 1380, 1402 n. 18 (1987), *cert. denied,* — U.S. —, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988).

6. At the hearing, intervenor's counsel stated that he recorded time contemporaneously and aggregated it later for purposes of the statement. While the Court does not doubt counsel's good faith, this does not change the fact that the application and documentation submitted to the Court falls short of the high standard required. *See National Ass'n of Concerned Veterans,* 675 F.2d 1319, 1327.

7. Illustrative entries are:

*April, 1982*—Research & investigation; confer w/ witnesses; meetings w/ client (Patkus office); Hearing before EEOC, Washington, D.C.2 (Hausner, Patkus, client)............ 14 H 15 min.

*May, 1982*—Tel. conf. w/ A. Carroll, Ffx City HRC; tel. conf. w/ client (Patkus & Hausner); meetings w/ witnesses; research; investigation; office conferences w/ client to prepare & draft position paper for HRC......... 17 H 15 min.

*June, 1982*—Draft letter to HRC; Tel. conf. w. D. McKinley, Counsel for Respondent (Nutrisystems); tel. conf. w/ client, HRC; meet w/ client *re* settlement proposal; draft settlement proposal; client & Patkus meeting w/ A. Carroll, HRC.......... 8 H 20 min.

*March 6, 1983—March 1, 1984*—Little activity during this entire period. Services consisted primarily of maintaining contact with Ffx County Human Rights Commission and with client; contacts with witnesses; ongoing update of case law *re* issues..... 5 H 30 min.

*September, 1984*—Tel. conf. w/ F. Allen (HRC). Meet w/ client to prepare confirmation of losses and expenses ........... 4 H 15 min.

*February, 1986*—Tel. conf. w/ EEOC attorney S. Murphy. Rcv & rvw EEOC Conciliation Agreement and Invitation to Participate in Settlement Discussions. Review file. Confer

These entries and others like them are simply not the clear and convincing evidence required to justify a fee award; they do not permit a "fair[8] evaluation of the time expended [or] the nature and need for the service...." *Hensley*, 461 U.S. at 441, 103 S.Ct. 1943. Nor do they permit the Court to distinguish between legal work essential to the case and investigative or clerical work which could have been performed by non-legal personnel or which should be billed at a lower rate.[9] *See Hall v. City of Auburn*, 567 F.Supp. 1222, 1227 (D.Me. 1983).

Yet another consequence of intervenor's counsel's inadequate documentation is inability to determine whether there was unnecessary duplication of work in light of the EEOC's participation where, as here, it is sensibly settled that an intervenor's counsel must take care to avoid this duplication.[10] Indeed, where, as here, intervenor's counsel works closely with EEOC's attorneys[11] the time should be discounted unless there is a "convincing description of the division of labor [accompanying] reports of contemporaneous or identical work performed by several attorneys." *Furtado v. Bishop*, 635 F.2d 915, 922 (1st Cir.1980). The fee claim documentation does not meet this standard and renders it virtually impossible on the current record to make confident judgments.

■ Claimant's proposed lodestar figure is fatally infirm for yet another reason. He advocates an hourly rate of $100. Contrary to practice approved in this Circuit, he did not establish that $100 per hour was the prevailing market rate "through affidavits reciting the precise fees that counsel with similar qualifications have received in

---

w/ client. Submit Response, listing available dates for conciliation conference.......... 4 H 55 min.

*July, 1986*—Tel. conf. w/ N. Gilbert, EEOC, Baltimore; Attorney G. Kiel, EEOC, D.C.. Case assigned for review for recommendation whether or not to prosecute. If recommended, then to Commission for further review and determination.

Tel. conf. w/ P. Jones, EEOC attorney, Baltimore, assigned to research & investigate to determine whether EEOC should prosecute. Mail copies of affidavits; transcript of 8/15/84 FCHRC hearing; Position paper of Wilett W. Bunton; names of witnesses, to P. Jones.......... 3 H 50 min.

8. Illustrative examples of this lack of specificity can be found in the statements for 1987 and 1988. All the September, 1987 hours (13) are said to be attributable simply to the intervention motion. Without more details, it is difficult to see how this many hours could be spent on such a relatively simple task. In November, 1987, two hours devoted to a time extension seems, without more explanation, to be excessive. In December, 1987, 3.5 hours were devoted to "seeking witnesses." This description is inadequate to permit a judgment as to the nature or necessity of this work. The same is true for the 21 hours in January, 1988 spent on research, especially research on fringe benefits given that no persuasive evidence on this issue was offered by intervenor at trial. Finally, there are numerous references to "confer with client" and "confer with Charleston" with no description of the nature or subject matter of the conference. The more than 35 hours devoted to conferences with client during the ten day period from January 30 and February 8, 1988 seems excessive. *See Daly v. Hill*, 790 F.2d 1071 (4th Cir.1986) (only

10 hours out of 107.4 hours for client conferences).

9. The more than 20 hours spent "seeking" witnesses, picking a witness up at the airport and making back pay calculations is an example of time that arguably should be billed at non-legal rates.

10. Thus, as noted in *EEOC v. Sage Realty Corp.*, 521 F.Supp. 263 (S.D.N.Y.1981):

Nevertheless, in an action such as this, where the EEOC is a participant, the private plaintiff's attorneys must make every reasonable effort to ensure that they do not unnecessarily duplicate work done by the government plaintiff. Just as any private lawyer whose client is footing the bill would do, an attorney representing an intervening Title VII plaintiff should take appropriate advantage of the work effects of the EEOC counsel.

*Id.* at 269. Also, in *EEOC v. Strasburger, Price, Kelton, Martin and Unis*, 626 F.2d 1272, 1274 (1980), the Fifth Circuit upheld a $2,500 fee for a claim by prevailing counsel for 236.91 hours because the principal responsibility for prosecution of the suit was upon the EEOC and the favorable result was achieved by EEOC's efforts rather than those of intervenor's counsel.

11. The fee application confirms this fact in stating that "[a]long with EEOC attorneys, Mr. Patkus interviewed all potential witnesses." This assertion, as well as others, raise an inference that there may have been some avoidable duplication in this matter. Also worth noting is that the EEOC was represented by two experienced counsel at trial who conducted much of the examination of witnesses.

comparable cases...." *Spell*, 824 F.2d 1380, 1402. Nor did he submit proof concerning recent fee awards in comparable cases. *Id.* Instead, he chooses to rely chiefly on his own billing practice [12] and his assertion that other attorneys at his experience level in the area were charging $125 per hour for handling comparable matters. The Court is not persuaded on this evidence that $100 per hour was a reasonable rate, at least for the first few years of this litigation. Pertinent here is that intervenor's counsel was then new at the bar and far from experienced. At the time he undertook the representation, he had only been at the bar approximately three years [13] and he had only participated in the handling of two previous civil rights cases, neither of which had been concluded, as of then. Indeed, counsel at the outset forthrightly raised the matter of his relative inexperience with his client and prudently recommended that she seek more experienced counsel.[14] In short, intervenor's counsel has not made the requisite factual showing to support a rate of $100 per hour. In these circumstances, a district court may rely on its own knowledge regarding customary rates and fees in light of the work done and the experience and reputation of the lawyer involved. *See Ecos, Inc.*

*v. Brinegar*, 671 F.Supp 381, 398 (M.D.N.C. 1987). In this Court's experience, $75 per hour, given all the circumstances, would be more appropriate for the first three years of the representation, with an increase justified thereafter.

In summary, intervenor's counsel's proposed lodestar figure is not acceptable. It is inadequately supported and documented. The claimant has simply not met his burden. In certain circumstances where this occurs it might be appropriate to identify and disallow specific hours and set precise rates over specific periods of time. Not so here.[15] The apparent precision would be illusory. Moreover, the result might well be unfair, for the lack of definition in work description might well justify rejection of large blocks of hours.[16] In these circumstances, courts have exercised their discretion to cut the proposed figure by a fixed percentage or amount based on the judge's overall familiarity with the case, its complexity and the counsel involved. *See, e.g., Uzzell v. Friday*, 618 F.Supp. 1222, 1226, 1229 (M.D.N.C.1985) (fees reduced 25% for attorneys and 35% for paralegals as a result of inadequate documentation); *see also supra* note 3.

12. While relevant, claimant's billing practice is *not conclusive, particularly in light of the manner in which he arrived at his hourly rate for this case.* Claimant stated that when he took on this case, his rate for all civil cases was $100 per hour. He also agreed with intervenor on a rate of $100, despite the fact that he had never litigated an employment discrimination case to completion. *Apparently, claimant concluded that this rate was reasonable given that another District of Columbia attorney he was working with, who had 20 years of experience, was charging $175 per hour. Thus, in this case, claimant's assertions of self worth do little to aid the Court in determining the prevailing market rate. More concrete evidence of the market rate should have been provided. Cf. National Ass'n of Concerned Veterans, 675 F.2d 1319, 1325–26.*

13. Defendant's counsel, by affidavit, urges as determinative the facts that intervenor's counsel (i) graduated in 1977 from a law school, Franklin Pierce Law Center, that was not fully accredited until 1980, (ii) was not admitted to practice law in Virginia until 1984 (admitted in District of Columbia in 1978), (iii) maintained his office in his home without a secretary, and (iv)

carried on a practice consisting largely of Criminal Justice Act appointments. None of these facts are particularly pertinent, let alone determinative, and the Court does not here rely on them. The Court notes, however, that intervenor's counsel deserves encouragement, not criticism, for his work under the Criminal Justice Act.

14. The failure of the fee application to meet the requisite standards of adequacy and specificity is a reflection of inexperience, not bad faith. The Court does not doubt counsel's good faith and diligence on behalf of his client.

15. Indeed, to attempt to do so here would require a searching evidentiary hearing into the conduct of this case that would impermissibly escalate the fee claim into a second litigation that might bid fair to swallow the first.

16. Indeed, there is some authority for denying a fee altogether. *See Vocca v. Playboy Hotel of Chicago, Inc.*, 686 F.2d 605, 607–08 (7th Cir. 1982) (age discrimination case). Such a result would be unfair and inappropriate here, notwithstanding the absence of appropriate documentation.

Given all the facts and circumstances of this case, the Court concludes that the proposed lodestar figure should be reduced by 25% from $43,689 to $32,767. This amount, the Court believes, fairly accounts for inadequate documentation and also appropriately accommodates the factors set forth in *Spell* and *Barber*.[17] Indeed, in this Court's experience, this figure is arguably generous, given the result obtained, namely $51,-696.72. That the Court's fee figure is more than 60% of the backpay award is a significant indicium of the reasonableness of the adjusted fee. Also noteworthy is that this was a straightforward case; it presented no novel legal issues, nor were the facts especially difficult. Intervenor was the only black managerial employee among hundreds of managers who worked at corporate-owned weight loss centers. Intervenor's immediate superior was an avowed racist who made no secret of her unsavory and repugnant views. Every witness confirmed this supervisor's unyielding racism. Although, the supervisor did not make the discharge decision, there was ample evidence to justify the conclusion that her racial prejudice was an infecting factor.

■ Two other positions urged by defendant merit mention. First, defendant urges disallowance of the more than $21,-000 in fees attributable to administrative proceedings before the Fairfax County Human Rights Commission (FCHRC). Intervenor's counsel, according to defendant, does not deserve compensation for almost four years of "unfocused wanderings" through the FHRC administrative process. Defendant claims that the administrative arena was a waste of time and that intervenor should have requested a right-to-sue letter years before she did. The Court rejects this position. The pace of progress in the FHRC was undeniably glacial. But this was not intervenor's counsel's fault. Moreover, Title VII envisions and encourages use of the administrative process. *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 65–66, 100 S.Ct. 2024, 2032, 64

L.Ed.2d 723 (1980). This policy goal would be frustrated were this Court to disallow fees attributed to intervenor's resort to the FCHRC. Accordingly, the Court declines to disallow the fees relating to the FCHRC proceedings.[18]

Defendant's second claim is that intervenor unduly prolonged the litigation and thereby inflated legal fees by refusing to negotiate settlement in good faith. According to defendant, intervenor's counsel made untenable and unrealistic settlement demands throughout the litigation. Such conduct, defendant contends, justifies a *pro tanto* fee reduction in a Title VII case. Intervenor denies prolonging the case by bad faith negotiation and claims that defendant was itself unreasonable in settlement negotiations and not forthcoming in producing the net sales records intervenor needed to make dependable damage calculations.

■ While there is no decision directly in point, there is analogous authority for the sensible proposition that a party should not be permitted to increase a fee award by making unreasonable settlement demands that unnecessarily prolong the litigation. In *Vocca v. Playboy Hotel of Chicago, Inc.*, 686 F.2d 605 (1982), the Seventh Circuit upheld a district court's denial of a fee in an age discrimination case for unreasonable settlement demands. There, plaintiff refused an early settlement offer which was close to the final settlement figure, insisting instead on figures many times that amount. In that court's view, a district may properly consider whether an " 'attorney, by pressing questionable claims and refusing to settle except on outrageous terms, could force a defendant to incur substantial fees which he later uses as a basis for his own fee claim.' " *Id.* at 607 (quoting *Mirabel v. General Motors Acceptance Corp.*, 576 F.2d 729, 731 (7th Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978)). Even where questionable claims are not involved,

---

17. *See supra* note 4 and accompanying text.

18. Note, however, that the 25% fee reduction is based on inadequate and insufficient documen-

tation for all the time claimed, including the hours attributable to the FHRC process.

it is a salutary principle that a prevailing party should not be permitted to inflate a fee award by using unreasonable settlement demands to extend a case. *Cf.* Rule 68, Fed.R.Civ.P. The question here is whether defendant's contention is factually correct.

■ A review of the record in this matter leads to two conclusions. First, the litigation could and should have been settled long before trial. Second, both parties bear the blame for prolonging this case. To be sure, intervenor's settlement demands were unrealistic. Even after the FCHRC had set damages at $79,402.41 in 1984, intervenor's demand was a whopping $450,000. In the face of the EEOC's damage calculation of $83,584.26, intervenor's demand dropped only to $250,000.[19] Equally ridiculous was defendant's $2500 offer to which it clung for some time. While there were some other offers made by both sides, the record is not entirely clear on timing or amounts. From the hearing held on the fee application, it is clear that there are conflicting factual claims and it would require a full evidentiary hearing to sort out relative fault. Accordingly, the Court concludes in these circumstances that defendant's argument for fee reduction on this basis must be denied. Future Title VII litigants must beware, however, for unreasonable settlement demands that unduly prolong litigation may be taken into account by the trial court in fixing the prevailing party's reasonable attorney's fee.[20]

The Fifth Circuit in the seminal *Johnson* decision aptly noted that the task of determining a reasonable fee award is distasteful and difficult. *Johnson v. Georgia Highway Express,* 488 F.2d 714, 720.

Mathematical precision is rarely achievable in this context and the results of the Court's judgment are unlikely to be satisfactory to any of the parties. This case is no exception. For these reasons, the Court urged the parties to resolve the matter of a fee amicably. Regrettably, this did not occur. In any event, the Court is satisfied that the fee amount determined here is, for the reasons stated, a fair and reasonable fee in light of all the facts and circumstances.[21]

### Costs

EEOC and intervenor seek their costs pursuant to Rule 54(d), Fed.R.Civ.P., and 28 U.S.C. § 1920.[22] Defendant, with one exception, does not object. The exception relates to intervenor's costs associated with the FCHRC administrative process. Defendant argues that these costs should be disallowed in conjunction with the proposed disallowance of fees associated with the FCHRC proceedings. Since the Court rejected the latter fee contention, so, too, it rejects the related contention on costs. Accordingly, the Court allows intervenor her claimed costs of $1069.28 and EEOC its costs of $1908.10.

An appropriate order on attorney's fees and costs will enter.

---

19. After the first day of trial, defendant's settlement offer was $51,000, an amount amazingly close to the Court's actual backpay award. Intervenor's attorney, however, demanded nothing less than $100,000.

20. Prudent defendants will avail themselves of Rule 68, Fed.R.Civ.P. *See Honea v. Crescent Ford Truck Sales, Inc.,* 394 F.Supp. 201 (E.D.La. 1975); *but see* Note, *The Conflict Between Rule 68 & the Civil Rights Attorneys' Fees Statute: Reinterpreting the Rules Enabling Act,* 98 Harv. L.Rev. 828 (1985). Prudent plaintiffs or intervenors will carefully document the history of

any bad faith or unreasonable intransigence on the part of a defendant.

21. The Court concludes that to have ordered a full scale second trial on the many disputed issues would have been inappropriate, it would have been an instance of allowing the tail to wag the dog. *See supra* p. 3, note 15.

22. *See Aracne v. Lucky Stores, Inc.,* 31 Empl. Prac.Dec. ¶ 33,565 (CCH) (D.Cal.1983); *Parker v. Califano,* 443 F.Supp. 789, 794 (D.D.C.1978).